No. 22,248.

HENRY HOFF et al., *Appellees,* v. PETER HOFF et al., *Appellants.*

No. 22,253.

HENRY HOFF et al., *Appellees,* v. PETER HOFF et al., *Appellants.*

SYLLABUS BY THE COURT.

1. WILL AND DEEDS—*Actions to Set Aside—Undue Influence—Mental Incapacity—Findings of Fact Conclusive.* The record in a consolidated action to set aside a will and to set aside certain conveyances examined, and the familiar rule adhered to that the determination of issuable facts is the exclusive province of the trial court, and that such determination will not be disturbed on appeal when there is substantial though controverted evidence to support the trial court's findings and judgment.

2. SAME—*Instruments Executed through Undue Influence.* The evidence examined, and held sufficient to prove that the will and codicil and certain conveyances of realty were made and executed through the undue influence of one of the principal beneficiaries of the will, who was also the grantee of the conveyances.

3. SAME—*Evidence—Mental Incapacity of Testator Shown.* The finding of want of sufficient mental capacity to make and execute the will and codicil and the conveyances of realty is supported by evidence.

Hoff v. Hoff.

4. SAME—*Property Transferred Without Consideration—Equitable Relief.* Where there are no actual creditors to be defrauded, and there is only a mental purpose to hinder imaginary creditors, equity will relieve against transfers of property without consideration.

5. SAME—*Claims of Undue Influence and Mental Incapacity Not Inconsistent.* While there is no necessary relation between undue influence and want of testamentary capacity, and the one may exist without the other, the findings of the trial court that a will, codicil, and conveyances were void because of the existence both of undue influence and want of sufficient mental capacity are not inconsistent. Both may exist together, and under the evidence to which the trial court gave credence, both did exist in this case.

Appeal from Ellis district court; JACOB C. RUPPENTHAL, judge. Opinion filed April 10, 1920. Affirmed.

*E. A. Rea,* and *E. C. Flood,* both of Hays, for the appellants.

*George W. Holland,* of Russell, *Lee Monroe,* and *C. M. Monroe,* both of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This lawsuit is a consolidation of two actions, one originating in Crawford county to set aside a will, and one in Ellis county to set aside certain deeds.

The litigants are the heirs of the late Henry Hoff, senior, who settled in Ellis county and who lived and thrived there as a farmer for many years, and who in his last years resided in Crawford county. Hoff died in 1916, leaving a large family of sons and daughters and grandchildren. Sometime before his death he made a will which bequeathed most of his property to the defendants. About that time and at other times he executed deeds to some of his Ellis county lands to one of his sons, Peter Hoff, a defendant here, and also surrendered to Peter a considerable amount of funds in bank and other personal property.

The Crawford county action was transferred to the district court of Ellis county, and consolidated with the action there pending.

One of the petitions alleged that at the times when the will and codicil of Henry Hoff were executed, the decedent—

"On account of his advanced age, feeble condition of health and habitual intoxicated condition, was so weakened, infirm, deranged and

impaired in body, mind and memory as to render him incompetent to fully and sufficiently know and understand the nature of his said alleged will and codicil. . . .

"That said Henry Hoff . . . at the time of the execution of said will and codicil . . . was under the influence of intoxicating liquor and was particularly subject and susceptible to the will, wishes, advice, suggestion, influence, persuasion, domination, direction and control of the defendants, particularly the defendant Peter Hoff, who in conjunction with the other defendants . . . formed and entertained the design to coöperate and act together in unduly influencing, etc., the said Henry Hoff to execute the said will and codicil, and pursuant to such design . . . the decedent . . . was by said defendants, and particularly the defendant Peter Hoff, persuaded and induced, irrespective of the active exercise and independent assent of his mind, will and judgment, to make and execute the will and codicil in question."

The petition also alleged that during the last few years of decedent's life, the principal defendant, Peter Hoff, had encouraged his father in a course of licentiousness, and by falsehoods had prejudiced him against the plaintiffs:

"That prior to the execution of said will and codicil decedent was charged and about to be prosecuted for illegal sale of intoxicating liquor and had been sued or was threatened with suit by one William Kauderer in Crawford county, and because of all of said suits or threatened suits and other trouble and disputes and contentions with housekeepers as aforesaid decedent was in such a frame of mind (which state of mind was aggravated by the excessive use of intoxicating liquors) that he feared he would lose all or a portion of his property, and that decedent was given aid and encouragement by said Peter Hoff with intent and purpose in so doing to cause decedent to become more susceptible to the inducement and persuasion of said Peter Hoff, and because of such aid, association, encouragement and sympathy given decedent in the course of conduct above stated said Peter Hoff occupied a position of trust and confidence towards his father and advised him relative to matters of business, and decedent to a great extent relied upon such advice and counsel.

"That immediately prior to his death decedent had $2,000 in cash and wheat and other personal property of value of $3,900, and was owner of three quarter sections of land (which is described) in Ellis county, Kansas.

"That prior to his death said decedent turned over said cash to said Peter Hoff and also executed and delivered to him deeds to said land; that said deeds and cash were procured by said Peter Hoff by means of false and fraudulent statements and representations and false promises to reconvey made by said Peter Hoff to his father, and said decedent was induced and persuaded thereby to make said deeds and would not have done so but for such false and fraudulent promises and statements

Hoff v. Hoff.

and agreements to reconvey made to him by said Peter Hoff; that after the execution of said deeds said Peter Hoff made repeated promises to decedent to reconvey at any time the latter desired; that all of said promises were made by said Peter Hoff with no intention of fulfilling same, but with fraudulent intention and purpose of obtaining and keeping said property for his own benefit and in furtherance of his scheme to defraud decedent of his property and also in the event of death of decedent his estate and heirs, including plaintiffs."

The petition to set aside the deeds to the Ellis county lands contained recitals very similar to those in the "will" case, and alleged—

"That in the execution of the aforesaid deeds the decedent did not intend to convey to the defendant Peter Hoff an absolute fee title to the property described therein, as said deeds would indicate, but only to pass a record title to said lands so as to make it appear that decedent had no property subject to attachment or execution by one desiring to collect any judgment or other debt from said property and to prevent the satisfaction therefrom of any claim which might be successfully urged against him and to discourage the bringing of any contemplated suit by any party against him; that the intention of the decedent was at all times to retain the equitable and legal title to said property, and simply to make it appear to others that he was without property and was not the owner of the property described in said deeds, which desire and intention to so convey said property was caused, induced and brought about by the fraudulent representations, assurances and promises of the said Peter Hoff as aforesaid."

Issues were joined, and the cause was tried without a jury. The district court made a general finding for plaintiffs, and also found—

"That at the time of the execution of said deeds and each of them and of the execution of said will and codicil that the deceased Henry Hoff, sr., did not have sufficient mental capacity to legally make and execute either of said instruments; that the execution of said deeds and each of them and of the said will and codicil and each of them was procured by the undue influence practiced upon the deceased by the defendant Peter Hoff, and that because of such undue influence and the mental incapacity of deceased, and the further lack of consideration for said instruments, that each of said instruments should be set aside and held for naught."

Defendants appeal, urging various errors. A comprehensive abstract of 180 pages is presented, which the court has perused with painstaking care. But we may be permitted to observe that this abstract contains a great surplus of evidential matter which is of no importance on appeal. The case turned al-

together on questions of fact upon which there was a plethora of evidence, part of which fully sustained the general finding for plaintiffs, and part of which would quite as readily have sustained a general finding for the defendants if the trial court had given greater credence to the evidence favorable to them; with that phase of the controversy, however, this court has little to do. (*Kahm v. Klaus,* 64 Kan. 24, 67 Pac. 542; *Perkins v. Accident Association,* 96 Kan. 553, 555, 152 Pac. 786.)

In *Brecheisen v. Clark,* 103 Kan. 662, 176 Pac. 137, it was said:

"Turning, as this lawsuit did in the trial court, almost wholly on the determination of the facts in issue, it naturally provoked a spirited contest and furnished an unusual opportunity for counsel skilled in the art of cross-examination. And this opportunity was used with such cleverness and penetration that a reviewing court with nothing but the printed record before it might well doubt the correctness of the jury's verdict. But the principle is thoroughly settled that the determination of the issuable facts is no concern of an appellate court, provided there is sufficient evidence upon which the verdict and judgment can be based. (*Burlington v. Wagoner,* 100 Kan. 10, id. 100 Kan. 439, 164 Pac. 1057; *Wideman v. Faivre,* 100 Kan. 102, 163 Pac. 619.)" (p. 663.)

(See, also, *Lumber Co. v. Workman,* 105 Kan. 505, 508, 185 Pac. 288.)

But it is asserted by defendants that the evidence wholly failed to prove that undue influence had been exercised upon the decedent. The evidence in the record shows—and the trial court obviously believed it—that the defendant Peter Hoff began to secure an ascendency over the mind and conduct of his father during the last few years of the old man's life. The father's mind had weakened; his morals had deteriorated; and he had become alternately moody and violent. Peter seemingly gave countenance to his father's irregular conduct in the employment of housekeepers, while the defendants disapproved of such conduct. Although some of the defendants had been very dutiful to the father in their minority, and although Peter had evidenced no peculiar merit as a son, he had gained an ascendency over his father. Peter directed his father's conduct in the making of the will. Peter brought his father to the scrivener and told the latter what to put into the will; he took charge of the will; he brought the will back to the scrivener, in the absence of the father, to have a codicil

written to disinherit his sister; and he took the codicil away with him. There is ample proof that the will was drawn as Peter dictated, and very slight evidence, if any, that his father had anything to say or to do about it except to sign it. There is no pretense that the father selected the witnesses or that they signed the will at his request. Moreover, there was evidence that Peter told one of the plaintiffs that—

"He was going to have the will made; was going to get his father to make a will. He (Pete) said he was going to have us all put in, but Henry or Charley. He said that he should have more than the rest of them because he was writing letters for his father. He told his father he wanted that will made. The reason why Pete wanted a will . . . [was] his own statement, because he (the deceased) would get in trouble with his housekeepers, so they couldn't get the property and he (Pete) wouldn't get anything. Pete had planned to go to Hays with his father on Saturday but it rained and Pete was mad. He said he [decedent] would fool around till the housekeepers would get him in trouble, then they would get the property and he wouldn't get any. . . . After making the will, Pete said, he had all of them in but Henry and Charley. He said he fixed it. The scrivener Harry Freese testified that Pete and his father came to his office and Pete said, We have come in to have Henry Hoff's will drawn.

"Q. Well, now what do you remember that Pete said? A. Well, Pete went on and told us who were to have this and who were to have that and in regard to the property, and in regard to the residue."

The trial court could well find, on this evidence, that it was the dominant mind of Peter which gave shape to those transactions, that Peter was the person actively concerned in the making of this will and codicil, and not the free agency of his father, and if this evidence was believed it met all the requisites to establish undue influence. (*Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634, and citations.)

Defendants cite the cases of *Sellards v. Kirby,* 82 Kan. 291, 108 Pac. 73, and *Carmen v. Kight,* 85 Kan. 18, 116 Pac. 231, to support their argument that the presence of Peter when the will was written and executed raises no presumption of undue influence. But the case we have does not rest on such slight circumstances as the mere presence of Peter. Moreover, *Sellards v. Kirby* concedes that the presence of a beneficiary while a will is being prepared may have its significance, especially when the testator has no independent advice.

" 'But the safer and more correct statement of the rule is that such a condition of affairs creates no presumption, but merely raises a sus-

picion which ought to appeal to the vigilance of the court. . . . It is a fact to be considered with other facts. It is undoubtedly a suspicious fact, but its weight depends, not solely upon its character, but upon the facts and circumstances with which it is connected.' [Underhill on Wills, § 137.]" (*Sellards v. Kirby*, 82 Kan. 291, p. 294.)

(See note in 28 L. R. A., n. s., 270 *et seq.*).

Touching the making of the codicil, the scrivener testified:

"Q. How do you remember about when that talk was? A. The codicil will show us the exact date. He [Peter] came into my office a few days previous to that and asked how a codicil could be put to that will and I told him he would have to get the original will and put it on the will and as his father was not in Ellis county, the will would either have to be taken down to him or sent down to him where he was in southeast Kansas, and have to be there signed and executed in the presence of two witnesses. . . . He returned in two or three days with the will . . . I next saw him at the time when I drew the codicil. He told me he had a piece of paper for memorandum and he told me just what his father wanted to do. . . .

"Q. Now, who was present when you drew that codicil? A. Nobody but Pete Hoff.

. . . . . . . . . . . . .

"Q. Who was present when this (deed to half section) was written? A. Peter Hoff.

"Q. Who told you, if anyone, what to put on this piece of paper? A. Peter Hoff."

A persuasive argument is made by defendants' counsel to the effect that the decedent was not a person easily influenced; they quote evidence of statements made by the testator which would tend to show that the will expressed his independent intentions touching the disposition of the property; they give plausible reasons why the testator might have disinherited the plaintiffs, and make a considerable showing that the testator had always been on good terms with the recipients of his bounty; but the significance of that argument is now lost since it did not shake the credence given by the trial court to the preponderating proof offered by plaintiffs.

"The judgment must stand in spite of any conflict of testimony or contradictory inferences, if there is substantial evidence fairly tending to support the decision of the trial court." (*Fairbank v. Fairbank*, 92 Kan. 45, 47, 139 Pac. 1011.)

Touching the conveyance of the Ellis county lands to the defendant Peter Hoff, one quarter was so conveyed at the suggestion of the scrivener of the will, as being a better

method of giving the land to Peter than to bestow it upon him by the will. This was assented to by Peter and his father. The scrivener testified:

"I said, in drawing this, that they never, that they should not put it of record until after Henry's death and to hold that and put that away with this will and then at that time they could put it of record and Henry said and Peter said at that time that that was all right and satisfactory."

Touching the later conveyance of a half section of land to Peter, part of the evidence tended to show that this land was deeded to Peter because of his father's relations with some of his housekeepers and because of the possibility of the father being mulcted in damages for an assault on one Kauderer. Defendants say that this was in fraud of creditors, and that the conveyance must stand, and they cite *Crawford's Adm'r v. Lehr*, 20 Kan. 509, 512, *Robinson's Executors v. Blood's Heirs*, 64 Kan. 290, 67 Pac. 842, and *Durand v. Higgins*, 67 Kan. 110, 72 Pac. 567. The rule of law, although sound, does not fit the facts. There were no creditors from whom decedent's property was to be concealed. Peter knew of his father's relations with the housekeepers, and he impressed his father with the fear that complications with some of them might arise.

Where there are no actual creditors to be defrauded, and there is only a mental purpose to hinder imaginary creditors, equity will relieve against transfers of property without consideration. (*Day v. Lown*, 51 Iowa, 364; *Harper v. Harper*, 85 Ky. 160, 7 Am. St. Rep. 583; *Gunderman v. Gunnison*, 39 Mich. 313; *Prewett v. Coopwood*, 30 Miss. 369; *Kleeman v. Peltzer*, 17 Neb. 381; *Rivera v. White, Guardian*, 94 Tex. 538.)

In *Holliway v. Holliway*, 77 Mo. 392, a brother induced another brother to execute certain conveyances by falsely representing that a woman was about to institute a breach of promise suit and might recover judgment. The court cited an earlier Missouri case, and set aside the conveyance, saying—

"To give instruments executed under such circumstances countenance and support, would, in all cases where confidential relations exist, make the weaker party a victim to the rapacity of the stronger, and allow him to whom interests are confided for preservation and protection to appropriate them to his own use." (p. 396.)

There is a letter in the record written by Peter in which he acknowledged that he held the half section in trust and prom-

ised to reconvey. The deed to the half section was prepared at Peter's request, in the absence of his father, and at the same time Peter caused the codicil of the will to be prepared, and it and the codicil were executed at the same time. There is sufficient evidence in the record to sustain the trial court's judgment as to the invalidity of both deeds. Viewed as testamentary documents, they are subject to the same infirmity as the will and codicil. Viewed as gifts *inter vivos,* the burden was on Peter, owing to his confidential relationship, to show that he did not obtain them through undue influence, and he failed to sustain that burden. (*Smith v. Smith,* 84 Kan. 242, 114 Pac. 245; *Coblentz v. Putifer,* 97 Kan. 679, 156 Pac. 700.)

The trial court found that at the times when the will, codicil and deeds were executed the decedent was not only subjected to undue influence, but also that he did not have sufficient mental capacity to make and execute either of said instruments. There was evidence to support that finding. It was shown that the decedent, who had formerly been a man of more than ordinary strength and vigor and of good business ability, had in his old age become grossly addicted to intoxicants, and in his last years drank much liquor night and day; he became an almost constant drunkard; he became violent to his family, frequently threatening to kill them and to kill himself; he parted with his wife, advertised for housekeepers and frequently changed them; he conceived an unreasonable hostility to some of his children, including one of his sons who had long been faithful and helpful to him, and became subservient to another son, Peter, who had shown no unusual filial devotion to him. His physician testified:

"He had trouble which was a kidney albumenura and an aortic trouble and as a consequence, he would have suppression of urine, and of course, that would interfere with his intellect. He was sluggish. He would wake up bright and I could not detect that he was dull at all but if that condition developed as it did two or three times, you could tell at once that he was off. . . . His physical condition was very poor, when he first came to me. . . . I told you (the attorney) that I would judge from the diagnosis of his physical condition that he was an excessive drinker of alcoholic liquors, which had continued a long period of time, which had impaired or weakened his physical or mental condition. . . . He was erratic and extremely nervous. . . . When he had these sluggish spells the natural conclusion is that he would be less likely to comprehend

Hoff v. Hoff.

what was going on, when he was in that condition. His memory was not good when he had those spells. His physical condition and the diseases from which he suffered had some effect upon his mind. He had a weakened and feeble mind. That condition continued nearly all the time that I treated him. . . . His trouble had been in existence in my judgment and had gradually been growing from worse to worse from the least calculation two or three years. He showed symptoms of extra nervousness and deterioration of memory during these sluggish intervals."

Stress is laid on the trite legal proposition that an habitual drunkard may make a will; but when all these other enumerated facts and incidents are also considered, we are bound to hold that the trial court's finding of decedent's want of sufficient testamentary capacity is supported by the evidence.

Counsel for defendants raise the point that the findings of undue influence and want of mental capacity to make the testament and to execute the deeds are inconsistent, and they cite *Gwin v. Gwin,* 5 Idaho, 271, 279, in support of that contention. We have read the Idaho case, and have examined the authority which is cited in its support. That authority is 27 A. & E. Encycl. of L., 1st ed., 497, where it is said:

"Undue influence is quite distinct from testamentary capacity. The former presupposes the existence of the latter.

"Capacity is the power to act. It depends solely upon the mental soundness of the actor. It exists whether the act stands in law or not. Undue influence affects the will of one having testamentary capacity, and invalidates what would otherwise be operative. Were there no capacity, there could be no will, and the question of whether or not there was influence would be an idle one. Undue influence and weakness of mind are frequently found together, but they have no necessary connection with each other. They should not be confused; neither should influence and total incapacity be confounded."

The text quoted cites *Thompson v. Kyner,* 65 Pa. St. 368, which is not quite so extreme. It reads:

"The learned judge, proceeding to the facts of the case, said, 'unless, therefore, there was some evidence tending legitimately to prove that some fraud had been practiced upon the testatrix at that time . . . or that some misrepresentation had then been made, or that some physical or moral coercion had been employed, such as to destroy her free agency, the court erred in submitting to the jury the question, whether undue influence had been exerted. . . . Neither moral nor physical constraint is to be inferred from mental weakness alone. That undue influence which suffices to destroy an alleged will, is distinct from weakness, and has no necessary connection with it.' " (p. 379.)

This court has no difficulty in discerning that undue influence and want of mental capacity have no necessary relation to each other. But the reasoning of the Idaho case is too subtle. While it may be conceded that one who has no mind to be influenced cannot be subjected to undue influence, yet one who has a feeble mind, a defective will, a confused intelligence and deficient understanding, may be highly susceptible to influence, due or undue. In *Mooney v. Olsen,* 22 Kan. 69, the attack on the will was grounded both on undue influence and want of sound mind and memory. This court recognized no inconsistency in the two distinct assaults on the will. In discussing that case, Justice Brewer said:

"The testatrix was, at the time of making the will, very much debilitated from loss of blood, and was in what the attendant physician called a semi-comatose state. The preparation of the will lasted some hours, although, when written, the instrument itself fills scarcely a page. As she roused from a state of stupor, she was asked to whom she wished to give certain property, and her answer noted. It would seem as though, after nearly every answer, she became insensible, and was rallied only by the use of stimulants. When her answers had all been noted in this way, the will was placed in form, and her signature affixed, though she was so weak that, after writing her first name, she swooned, and had to be rallied again by the use of restoratives before finishing her signature. Of course, there will always be a doubt whether a will executed under such circumstances really expresses the deliberate purpose and desire of a testator in the distribution of his property; yet mere feebleness and weakness like hers do not, of themselves, prove fraud or undue influence —they merely show a condition easily accessible to undue influence. The power of resistance is weakened, and the mind yields to fear or pressure which ordinarily would make no impression." (p. 74.)

The finding in the present case is that the decedent did not have sufficient mental capacity; it was not a finding of total mental incapacity. In 1 Jarman on Wills, 6th ed., page 66, it is said that although there is no necessary connection between undue influence and partial incapacity, they are apt to be found together. The books are full of cases where wills have been set aside for want of testamentary capacity. How came such wills to have ever been made? Undue influence or similar fraudulent wrongdoing on the part of some intermeddling self-seeker is commonly and most probably the correct explanation. The court holds that the trial court's findings of undue influence and want of "sufficient mental capacity" are not inconsistent.

Various minor matters urged by defendants have been carefully considered, but nothing further can be noted which would justify further discussion.

We can but repeat that this is a *fact* case, one which could have been decided either way upon the evidence. However, no reversible error is disclosed in the record, and the judgment is therefore affirmed.