No. 36,020

In re Estate of Grace G. Kemper, Deceased (GRACE JOHNSON et al., *Appellees,* v. IDA M. BRIGGS et al., *Appellants*).

(145 P. 2d 103)

Opinion filed January 22, 1944.

*James A. McClure,* of Topeka, argued the cause, and *Robert Stone, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman,* all of Topeka, were on the briefs for the appellants.

*Guy B. Park,* of Kansas City, Mo., argued the cause, and *Frank E. Miller,* of Topeka, was on the briefs for the appellees.

The opinion of the court was delivered by

PARKER, J.: This is an appeal from the judgment of the district court of Shawnee county admitting to probate a certain instrument purporting to be the last will and testament of Grace G. Kemper, deceased, and reversing the probate court of that county in the latter's refusal to admit such instrument to probate.

On July 29, 1942, Grace G. Kemper, a widow, died a resident of Shawnee county, Kansas. Within a short time thereafter a petition for the probate of a will executed by her on June 1, 1942, was filed in the probate court of the county in which she had died a resident. It is conceded by all parties such will was properly executed by the testatrix on the date alleged and that she had sufficient mental capacity and was not under duress at the time of the execution thereof. When the will was offered for probate certain markings, presently referred to in detail, appeared thereon. It is also conceded those marks were made by Mrs. Kemper.

The will in question was prepared for Mrs. Kemper by George Wark, an attorney of Caney, and consisted of four pages. Omitting formal portions thereof it contained thirteen paragraphs, eleven of which had at no time been marked or changed in any manner by the testatrix.

Referring now to the unchanged portions of the will and their contents, paragraphs I, II and III provided for the revocation of all former wills and directed the place of burial of testatrix and payment of her debts and funeral expenses. Paragraphs IV, V, VI, VII and VIII were dispositive in character and by their terms bequeathed small amounts of money, amounting in all to the total sum of $77, to divers relatives and friends of the decedent and to certain fraternal organizations.

The markings heretofore referred to were made by testatrix with both pencil and pen and affected paragraphs IX and X of the original instrument, also the signatures of the attesting witnesses thereto. Inasmuch as such markings gave rise to this lawsuit and they are not in such form as to make them susceptible of accurate verbal description we have caused the marked portions of the original will to be reproduced and incorporated in this opinion.

Paragraphs IX and X with the signatures of the attesting witnesses, together with all markings thereon, as they appeared when the original will was offered for probate follow:

### IX.

After the full payment of all the above and foregoing bequests I hereby give, grant, devise and bequeath to the following nieces and nephews of my late husband, W. H. Kemper, the following sums, to-wit:

Mrs. Green Johnson, Jefferson City, Missouri ------ $1,000.00

Mrs. Catherine Smith, Siloam Springs, Arkansas ---- $1,000.00

Mr. C. C. Kemper, 702 S. Barton Street, Santa Anna
California -------------------- $1,000.00

Minnie Kibaigh, 2012 Dexter Street, Seattle, Washington ------- $1,000.00

Mittie T. Kemper, 302 Market Street, Jefferson City, Missouri ------- $1,000.00

Holland Thompson, 3032 North Maryland Street, Milwaukee, Wisconsin ------- $1,000.00

### X.

And if after the bequests heretofore mentioned are fully paid and all cost of administration of the Estate, there remains any residue, the same shall be equally divided between the parties mentioned in paragraph IX, to-wit: the nieces and nephews of my late husband, W. H. Kemper.

WITNESS TO WILL:

(P. O. Address)

(P. O. Address)

Since it is conceded the will as originally executed would have been entitled to probate had it not been for the markings placed thereon by testatrix subsequent to its execution, reference to evidence offered by the parties will be restricted to that pertaining to the changed condition of the will.

In the probate court, parties seeking to probate the will produced George Wark as a witness, who testified in substance as follows: Shortly before its preparation he had a conversation with Mrs. Kemper, who told him what she wanted in her will; in that conversation he received the impression her people had received their share or that they (Mr. and Mrs. Kemper) had helped her people and had never done anything for his people; he took notes of what Mrs. Kemper desired and went to Caney where he prepared a scratch copy, and then sent it to her at Topeka with instructions to mark between the lines if she desired any changes; she returned the copy in practically the same condition and he thereupon drafted the original will which he mailed to her for execution; about June 26, 1942, he received a letter from Mrs. Kemper (Exhibit 2) and enclosed in it was her original will; he replied on June 26 (Exhibit 3); on June 30, he received another letter from Mrs. Kemper (Exhibit 4); on July 6 he replied (Exhibit 5); receiving no reply he mailed her another letter on July 27 (Exhibit 6) to which he received no reply; when returned to him by Mrs. Kemper on June 26, 1942, the pen and pencil markings on paragraphs IX and X and markings through the two signatures at the bottom of page 4, appeared on the will; he received the will in the condition it was in when offered for probate.

To complete Mr. Wark's testimony there should be added the following information which details the pertinent portions of the correspondence referred to by him:

Exhibit 2 directs action, and reads:

"I had to change my will—am sending to you & make it right. . . . "Have been quite sick—am some better now."

Exhibit 3 requests information, and states:

"Your letter and will just received and so glad to hear from you, we think of you and Mrs. Wark has been worried about you, she too has been ill.

"Now relative to the change in your will in the ninth paragraph of the will you name six of Mr. Kempers nieces and nephews and in the alterations in that paragraph I note you have stricken out all but C. C. Kemper and have added Ruth Kemper—now that is plain enough but in the returned will here in paragraph 10 you state that any property shall be given to the parties named

in paragraph ten that is to Mr. Kemper's nieces and nephews. Now what I want to know—and as soon as you tell me I will re-draw the will, if there is any property left after all the bequests have been made, including the $2,000.00 to C. C. and Ruth Kemper, who do you want that willed to.

"Please let me hear from you by early mail."

## Exhibit 4 contains additional instructions, and directs:

"Leave out—ninth paragraph—None of Mr. Kemper's nieces & nephews or none of my nieces or nephews are to receive any money after I am dead. I am giving it to them now while I am alive.

"Am not expecting to leave anything after I am dead. C. C. Kemper & Ruth Kemper are the only ones I am leaving anything to. Have had nothing & the others have. . . ."

## Exhibit 5 seeks additional information, and inquires:

"Your good letter duly received and so glad. to hear from you and do trust you are feeling better;—Now Mrs. Kemper I did not quite understand just how or the way you wanted the change made in your will, as I interpret your letter all the ones you had mentioned in the par- 9 and 10 had received their share now with the exception of C. C. Kemper and Ruth Kemper each to have $1,000 is this correct—have you sold your apartment there and all your stock—the point I want to be clear on before I draw the new will is if there is any thing left after all the bequests have been taken care of in the will what do you want done with it do you want some one designated to receive anything that is left after each one mentioned in the will has been or rather received their legacy.

"If I remember you stated that you had already arranged for a marker in the cemetery. Is that correct.

"Please let me hear from you relative to the above. . . ."

## Exhibit 6 makes further inquiry, and recites:

"Several days ago I wrote you relative to certain information that it would be necessary to have before I could complete the document you wanted to prepare. Not having heard from you I fear you are ill, write tell us just how you are feeling and make the notations I requested. . . ."

After the probate court had refused to admit the will to probate on the express ground the testatrix had revoked it by cancellation and obliteration an appeal was taken to the district court. Prior to the trial in that court the parties stipulated the testimony of all witnesses used and all Exhibits introduced in probate court might be received and considered as evidence by the district judge. During the trial a transcript of the testimony of all such witnesses, including the deposition of one witness and all Exhibits, were offered in evidence and admitted without objection in support of the will. The only other evidence adduced was that of two women with respect to conversations had with Mrs. Kemper.

With specific reference to any talks had with her relative to changes in her will one of these two witnesses, a Mrs. Galletly who had known Mrs. Kemper for a long time and lived next door to her, was asked questions to which she made answer as follows:

### Direct Examination:

"Q. State what she asked you to do. A. She asked me if I would look after her mail and bring it to the second floor and give it to her, or put it under the door, because she was looking for an important letter from Mr. Wark. I didn't know who Mr. Wark was. Then the next day she came again and says, 'are you going to not fail me about my mail?' I says, 'No, I will not fail you about your mail.' She says, 'It is about some important papers that I want to make some changes in.' That is all she said to me. That was the last of June or the first of July.

. . . . . . . . . . . . . . . .

"Q. Well, did she say why she sent them? A. She didn't say why. She made the statement that she was having these changes made in some important papers, but she didn't state to me what important papers.

"Q. She didn't say it was a will? A. No; she said it was some important papers she was having some changes made in, and was corresponding with Mr. Wark. I didn't know who Mr. Wark was.

"Q. How many times did she mention that to you? A. She was very much concerned the latter part of June and the first of July about her mail."

### Cross-Examination:

"Q. Well, do you pretend to say that her exact words were that she was having some changes made, or that she was making some changes, or had made some changes, or was intending to make some changes? A. My best recollection that I got was that the papers were so important that she was making some changes in some important papers. That is the impression that I got.

"Q. That is, she was changing the effect of some important papers. A. That is the impression I got. I asked her no questions, and she told me no further."

The other witness, a Mrs. Stogsdill, related conversations had with Mrs. Kemper, the substance of which was that Mrs. Kemper did not like either her relatives or those of her deceased husband; she didn't want any of his relatives or her own in her house after she died and told witnesses not to let them in; she had helped her relatives all her life and Mr. Kemper wanted his relatives to have what was left; that she didn't leave her folks anything and desired to leave what was left to his relatives.

On the evidence heretofore related the district court found the markings upon the will were made by Mrs. Kemper subsequent to its execution, that she did not intend to die intestate and the marks did not constitute a revocation of such will nor any change or alter-

ation thereof. Thereupon judgment was rendered admitting the will as originally executed to probate. The heirs at law of Mrs. Kemper appeal.

From what has been heretofore related it will readily be observed the instant controversy centers around the intent and purpose of Mrs. Kemper in making the marks which appear upon the will. The principal issue, although there are other questions which have a bearing on its determination, is whether the will was revoked by her action.

It must be concluded from an examination of the record both the facts and the law governing a determination of such issue are subject to consideration and must be reviewed upon appeal. Except for two witnesses whose undisputed testimony is before us and had very little if any bearing on the principal question to be determined, this case brings to us practically the same evidence as was presented to the district court. Under such circumstances when the evidence is written, documentary in character or in the form of depositions or transcripts, it is the duty of this court to decide for itself what the facts establish, substantially as it would in an original case. (See *Protheroe v. Davies*, 149 Kan. 720, 729, 732, 89 P. 2d 890; *Goldberg v. Central Surety and Ins. Corp.*, 145 Kan. 412, 414, 65 P. 2d 302; *DePee v. National Life and Accident Ins. Co.*, 144 Kan. 751, 62 P. 2d 923; *Wollard v. Peterson*, 143 Kan. 566, 571, 572, 56 P. 2d 476, and *Mathewson v. Campbell*, 91 Kan. 625, 627, 138 Pac. 637.)

Whatever claims may be advanced by parties seeking to either procure or defeat the probate of a will where the principal question at issue is whether it has been revoked one thing must be conceded, and that is, that so far as the subject of revocation is regulated by statute, the provisions of the statute are mandatory, they must be strictly pursued and a will cannot be revoked in any other way than that provided therein. This is the rule regardless of a testator's intention. (*In re Estate of Grattan*, 157 Kan. 116, 120, 121, 138 P. 2d 497, and 28 R. C. L. 171, § 128.)

So, in our state, since the subject of revocation is specifically regulated by legislative fiat the express language of the statute must be considered and governs the ultimate disposition of all questions pertaining to the revocation of wills.

G. S. 1941 Supp. 59-611, except in cases of revocation by marriage, birth, adoption or divorce, covers the subject, and reads:

"Except as provided in section 46 [59-610], no will in writing shall be revoked or altered otherwise than by some other will in writing; or by some

other writing of the testator declaring such revocation or alteration and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself or by another person in his presence by his direction."

In their construction and interpretation of statutes of this character the decisions, textbooks and law treatises, without exception recognize the rule that in order for any act of revocation to be effectual the testator must not only be in possession of his mental faculties and capable of making a will at the time but there must be a concurrence of both the physical act and the intention. Mere intention to revoke unaccompanied by any sufficient act is not enough and no mere act is effective unless accompanied by an intention to revoke. (See *Sellards v. Kirby*, 82 Kan. 291, 297, 106 Pac. 73; 1 Page on Wills, Lifetime ed. 768, § 425, 780, § 431; 1 Schouler on Wills, 6th ed. 663, § 581; 1 Alexander Commentaries on Wills, 703, § 518; Thompson on Wills, 2d ed. 203, § 155; 1 Woerner, American Law of Administrations, 3d ed. 126, § 48; 1 Underhill on Wills, 303, § 223, 306, § 224; 68 C. J. 817, § 511, and 28 R. C. L. 168, § 124, 169, § 125.)

So, also, although there was some dispute as to the force and effect to be given the term "canceled" when used in the earlier statutes, the rule at modern law is that cancellation may be accomplished by drawing lines through one or more words of the will with intent to nullify it even though the original words may still be read, the form and extent of the lines being totally unimportant so long as they constitute a physical token of the intent to revoke. (See 68 C. J. 819, 820, § 518; 28 R. C. L. 180, § 138; 1 Page on Wills, Lifetime ed. 773, § 429; 1 Schouler on Wills, 6th ed. 682, § 597; Thompson on Wills, 2d ed. 206, § 158 and 1 Underhill on Wills 317, § 231.)

Likewise, it can be said, the same is true of the modern rule with respect to the construction to be placed on the term "obliterated" when used in the statutes. (68 C. J. 821, § 519; 28 R. C. L. 184, § 143; 1 Page on Wills, Lifetime ed. 784, § 433; 1 Schouler on Wills, 6th ed., *supra*, and Thompson on Wills, 208, § 159.)

With the general principles of law heretofore related the parties to this action are in substantial accord. It is only when we come to a consideration of the legal effect of the marks appearing on the will and the intent of the decedent in placing them there a complete lack of agreement arises. Appellants strenuously insist the marks

were made with the then intent and purpose of revoking the will and that when placed thereon were such marks of cancellation and obliteration as would result in its immediate revocation under our statute. The appellees just as strenuously urge the marks were made by the testatrix without any intention of revoking the instrument and with the thought of keeping it in force and effect until such time as she saw fit to execute another will. They further urge her purpose in making the marks upon the instrument was merely a method of indicating to her attorney the changes she desired to have appear in the new will, which she requested him to draft for her, and finally urge that irrespective of her intention they were insufficient to come within the meaning of the terms "canceled and obliterated" as used in the statute, and under no circumstances amounted in law to a revocation of the instrument.

On the question of what constitutes a cancellation or obliteration of a will, and what facts must exist and what evidence must be produced to uphold a mutilated will on the theory it has not been revoked or to strike it down on the ground it has been, both appellants and appellees have cited numerous interesting cases which we have read along with many others. Questions dealing with the interpretation, construction, and force and effect of wills are as old as the hills themselves. Various ramifications of the subject of revocation of wills have plagued the judiciary from the early days of the ecclesiastical and common law courts down to the present moment. It is hardly necessary to state that during that time literally thousands of decisions have been handed down on the subject, or during such period there was no unanimity of opinion among the courts in their views as to what was sufficient to require a conclusion a will should be upheld or revoked. Appellants have cited cases which purport to be authority for their position. Appellees also point to decisions which appear to be authority for theirs. We have read many others which might well be cited by one or the other of the parties to this lawsuit. Many of the decisions are based upon a factual situation which influenced their rendition. Many others rest upon the particular statute or law in force and effect at the time. To read them all, or attempt to differentiate between them or to attempt to harmonize the countless decisions, some of which it must be conceded are incapable of harmonization, would require volumes and more time and effort than this or any other court can give to any legal question, irrespective of its interest or importance.

We have not attempted, nor shall we make an effort to pick out a limited number of cases dealing with the subject and adopt the reasoning to be found therein to the exclusion of others and the reasoning to be found in them. We are content to refer those who, from the standpoint of research, are interested in the subject to the numerous textbooks, treatises, and digest systems, dealing with the subject of Revocation of Wills where countless decisions are referred to and cited.

It can, however, be stated as a general proposition the doctrine announced in the more modern cases is that it is not so much the extent or character of the markings of cancellation and obliteration that govern, as it is the present intent of the testator in making such marks, the determination of which is a province of the court, to be inferred from the nature of the act or shown by aliunde evidence. If, therefore, marks of obliteration and cancellation appear upon a will when produced for probate, and the court after a full and complete investigation concludes the marks were placed thereon by the testator with the intent and purpose of revoking it, probate of the instrument should be refused on that ground. Conversely, if under the same circumstances and conditions, and notwithstanding the fact marks of cancellation and obliteration appear upon the will, the court concludes such marks were placed thereon by the testator without any intent of revocation, the instrument should be given full force and effect and admitted to probate so long as such marks do not entirely obliterate its language and make it impossible for the court to construe the instrument in line with the intent and purpose of the testator and/or testatrix in executing it.

Guided by these legal principles can it be held that the will in the instant case, as originally executed by Mrs. Kemper, was unrevoked on the date of her death and therefore entitled to probate as a valid and subsisting will. We come now to immediate consideration of the intent of the testatrix.

First of all appellants contend, under the circumstances of this case, a presumption exists that revocation of the will was intended by the testatrix. Appellees counter with the proposition it is only when the markings of cancellation are unexplained that such a presumption has any force whatsoever. There is sound basis for appellants' contention. The general rule is that the finding of a mutilated will among the effects of a competent testator raises a strong factual inference, often referred to as a presumption, that

the acts of mutilation were performed by the testator *animo revocandi*. (68 C. J. [Wills] 990, § 758; 1 Woerner, American Law of Administrations, 3d ed. 128, § 48; 1 Underhill on Wills, 317, § 232; notes, 62 A. L. R. 1372, 1373; annotation, 115 A. L. R. 712; 1 Alexander Commentaries on Wills, 747, 748, § 580; 1 Jarman on Wills, 7th ed., 132, 133.) That this court recognizes the existence of such rule is evidenced by its opinion in *Sellards v. Kirby*. 82 Kan. 291, 298, 108 Pac. 73.

Appellees' position with respect to the force of the presumption is too broadly stated. A more correct statement would be that the presumption exists but is prima facie merely, subject to rebuttal by other evidence and when explained ceases to longer be a determinative factor on the question of revocation. Since the instrument under consideration was produced by the attorney of the decedent who received it from her under instructions herein quoted, the query may arise as to whether the rule is applicable. We believe, under the circumstances of this case, the possession of the attorney was that of the decedent and the presumption exists the same as if the will had been found in her immediate effects and then offered for probate.

As has been heretofore indicated, in its final analysis, the issue is one which must be determined by the court from what it can glean from the condition of the instrument and other evidence as to the intent of Mrs. Kemper in placing on her will the marks appearing thereon, concluding of course, as we have, they were sufficient in form and character to be regarded as marks of cancellation and obliteration within the meaning of the terms "canceled and obliterated" as used in the statute. What was Mrs. Kemper's intention and purpose when on that day, which so far as the record shows is unknown to any living person, she made the mutilating marks on the portion of the instrument here reproduced for the scrutiny of future readers of this opinion? Was her action that of a woman who had become disgruntled with those to whom she had bequeathed the terrestrial things belonging to her and for which she would have no use in the celestial realm to which she knew she was soon to depart? Did she desire to create a situation where those to whom she had theretofore devised the major portion of her estate would no longer share in the emoluments to be derived therefrom even though she might die intestate before executing another will which would conform to her then desires? Did the

fact she had made up her mind to bequeath approximately one-half of her estate to an entirely new beneficiary cause her to make the marks with the intent and purpose to revoke and do away with the force and effect of the instrument she then had before her? Such is the claim of the appellants. Was her action that of a woman who desired the document then in her possession and control to remain in full force and effect, notwithstanding her apparent, if not conceded purpose to almost wholly change and revamp the principal dispositive portions thereof, until that day when she might be able to execute a new will which would carry out the ideas she then had with respect to the disposition of her property? Or, was her conduct that of one who merely intended thereby to apprise her attorney of what she desired in a new will, leaving the old one to continue in full force and effect? The appellees so contend. Both appellants and appellees advance their contentions with sound reasoning supported by respectable authorities. That this is true and that the question is not devoid of difficulty is evidenced by the fact the judge of the probate court, well versed in the practice of law and experienced in probate matters, decided the will had been revoked while the learned judge of the district court, equally well versed in legal knowledge and benefited by years of successful experience as a trial judge, determined on appeal that it had not.

In our consideration of the question we have endeavored to give full effect to all evidence which in our opinion is indicative or determinative of Mrs. Kemper's intent and purpose.

We first give our attention to the marks appearing in paragraphs IX and X. It would seem they justify the conclusion that before making them Mrs. Kemper had decided she desired to do away with five out of six of the principal dispositive bequests made by her and the residuary clause in toto. True, she wrote in the name of Ruth Kemper as a devisee and indicated her desire to leave her $1,000, but it must be assumed, having gone through the formalities of executing at least one will, she knew this bequest would not be effective until she had executed a new one. There was nothing in this action which can be said to indicate an intention to keep the original instrument in force. Worthy of note, also, and we believe it to be so apparent from an examination of the instrument as to preclude dispute, is the fact the pencil marks were made on the will prior to the making of the more prominent ink marks appearing

thereon. Certainly, there is nothing in the evidence to which we have just referred to substantiate appellees' claim. If anything, the fact that the marks had, at least in the mind of a layman unfamiliar with the law, canceled five of the six bequests and in addition had left undisposed of the greater portion of the estate, creates an inference the testatrix had ceased to rely upon the provisions of the instrument. True enough, as suggested by appellees, intestacy as to the marked portion of IX and all of X might not be the result if the testatrix had not so intended. Conceding that point, it must be admitted a person is presumed to contemplate that which results from his act is going to be the normal and usual thing—in this situation cancellation of all bequests marked out and intestacy as to what appeared to be the greater portion of the testatrix's property. To expect her to be cognizant of the rule of law suggested by appellees would require her to contemplate the unnatural, not the normal, thing which would usually result from such action. Indicative also, although not necessarily determinative of her intent, is the fact that after making the lead-pencil marks Mrs. Kemper made the ink marks referred to.

Turning now to the lines drawn through and across the names of the attesting witnesses and their signatures, we do not feel that action, standing alone, would be grounds for revocation of a will. It should, however, be considered along with the other facts and circumstances affecting its validity, and is entitled to some weight in determining the intention of the testatrix. Certainly it had no significance as a mere suggestion to the attorney for the drawing of a new will and tends more forcibly to impel a conclusion she did not intend the will in controversy should ever be probated.

We next give our attention to the letters written by Mrs. Kemper to her attorney. In her first she enclosed the will and stated "I had to change my will—am sending to you & make it right." In that statement, standing out clear as the rays of the sun on a cloudless day, is the fact that in the verb she used the past tense, not present or future. Suppose she had written a friend she had to change the style of shoes she had been wearing, or she had to change her bank account, or suppose she had been the proprietor of a club whose membership was pledged to conform to rules and regulations promulgated by her, and had written Mr. Wark that she had to change her rules and requested him as her attorney to revamp them. Could it be successfully urged she was still wearing the old shoes or

continued to do business at the old bank, or was enforcing the rules which she had changed. While these illustrations are of necessity not entirely apropos they do serve to exemplify the point that by the use of the past tense a person denotes action that had put an end to a situation theretofore existing. So, in the language used by Mrs. Kemper in her first letter, we believe she indicated an abandonment of the original will. In so doing she created evidence which, even though it was used after her death, tended to establish a revocation of the instrument to which she referred. In her second letter she advised Mr. Wark that C. C. Kemper and Ruth Kemper were the only ones she was leaving anything to. It must be remembered the writer was an old lady, stricken with what developed into her last illness. She must have known her days on earth were numbered. When she wrote her attorney that the two individuals just named were the only ones she was leaving anything to, that the others had received theirs, she evidenced her belief she had revoked her will by making the marks appearing thereon and affirmatively established that when she made them she did so with that intent and purpose. Something could be said regarding the intent indicated by Mrs. Kemper in the use of the language to be found in the first paragraph of Exhibit 4, but since, so far as the record shows there is some inconsistency between that language and other established facts and circumstances, we prefer to dispose of it with the bare statement there is nothing to be found therein which could possibly be regarded as substantiating appellees' contention that at the moment Mrs. Kemper considered the provisions of the original will to be in force or contemplated they would be carried out in the event of her death before the new will was executed.

The only other evidence, to which we have not referred, is the letters written by Mr. Wark and the oral testimony of the two women herein referred to and offered in the district court. As for the letters they merely serve to explain the ones written by Mrs. Kemper and any conclusions there expressed have no place in a determination of the issue. Reference to the oral testimony discloses it to be of little, if any, value. Mrs. Galletly did say Mrs. Kemper told her she was having some changes made in some important papers which she did not describe in definite terms. The statements cannot be construed to mean that Mrs. Kemper at that time considered her original will to be a subsisting instrument. If any

inference arises from the testimony of this witness it springs from her statements regarding Mrs. Kemper's concern about receipt of her mail which might be construed as some indication of a desire to die testate. All Mrs. Stogsdill's testimony tended to establish was Mrs. Kemper's attitude toward her relatives and the fact she told her she desired to leave what was left to his (Mr. Kemper's) relatives. For all the record shows the remark could have referred to the two individuals named by Mrs. Kemper in her second letter to Mr. Wark. In any event, this evidence cannot be regarded as throwing any light on the status of the will in controversy.

In our search of the record we have experienced some difficulty in finding any substantial evidence tending to rebut the presumption the acts of mutilation were performed by Mrs. Kemper *animo revocandi*. Conceding that point, in view of all the facts and circumstances disclosed by the evidence, in the light of the condition of the will at the time it was sent to Mr. Wark, and the construction, we feel compelled to place upon the language used by Mrs. Kemper in her letters, we have no difficulty in concluding that when she placed the mutilating marks upon the will she did so with the intent and for the purpose of revoking it.

Appellees invoke the doctrine of dependent relative revocation, asserting Mrs. Kemper never intended to die intestate and that the revocation of her original will was dependent upon her execution of the new one. It may well be that at the time of the mutilation of the original document she intended to execute a new will at some future time. Nevertheless, if she intended, and we so hold, her acts of cancellation and spoliation to have a present effect, it is immaterial whether she intended to execute a second will. The document was then revoked, notwithstanding her future intention. Under such circumstances there is no occasion to consider the doctrine referred to.

As stated in 1 Jarman on Wills, 7th ed. 136, "the mere intention to make at some definite future time a new will, is not enough to prevent revocation."

And in 1 Page on Wills, Lifetime ed., § 478 at page 878, this is said:

"If the act of revocation is performed when testator does not intend that such act shall be conditional, and he is not induced to revoke by mistake, fraud, and the like, questions of dependent relative revocation do not arise although the ultimate disposition of testator's estate at his death may not be

what he had contemplated when the original will was revoked in whole or in part."

In accordance with the conclusions herein announced the judgment is reversed.

THIELE, J. (dissenting): I think a proper disposition has not been made of this appeal. Generally speaking I find no fault with the rules of law stated—my reasons for dissent are predicated on the proposition that the law has not been applied to the facts as I understand them. The portion of the will reproduced in the opinion shows only lines drawn on the will and does not include the signature of the testatrix. She signed the will "Grace G. Kemper" and her signature was not erased, obliterated, canceled, or marked in any manner. Our statute does not provide for any partial revocation, as do the statutes of some states, but if it did, it is clear that no attempt was ever made to erase, cancel or obliterate the name of C. C. Kemper or the amount of the bequest to him in Paragraph IX, that part stands unchanged. I think it clear from Mrs. Kemper's letter to her attorney and from the oral testimony that when Mrs. Kemper made the marks on the will and inserted the name of Ruth Kemper and the amount of $1,000 in Paragraph IX and sent the same to her attorney, she had no intention of revoking the will, what she did was for the purpose of advising and instructing her attorney of changes to be made and which she asked him to make right. Had she intended to revoke her will she would have destroyed the primary thing about it essential to its validity, and that was her own signature, and that she did not do.