No. 33,962

LAURA KIRSCH, *Appellee*, v. FEDERAL LIFE INSURANCE COMPANY, *Appellant*.

(87 P. 2d 591)

Opinion filed March 4, 1939.

*Malcolm McNaughton,* of Leavenworth, for the appellant.
*C. H. Boone,* of Leavenworth, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action to recover on an automobile accident insurance policy. The plaintiff beneficiary recovered, and the defendant appeals.

Briefly the facts were these: The late Emma Brandon was an employee of the State Orphans' Home, near Atchison. On April 6, 1929, defendant issued to her its "Special" Automobile, Travel and Pedestrian Accident Insurance Policy wherein, among other matters, it agreed that if she lost her life through an accident to an automobile which she was driving, it would pay her named beneficiary the sum of $1,000, with 10 percent additions thereto for every year the policy was kept in force until the principal sum would be increased 50 percent.

Plaintiff alleged, and her evidence tended to prove, that Miss Brandon left the State Orphans' Home in the forenoon of March 7, 1937, in her automobile. Before she had driven more than a block or two, on a downhill grade from the home, she lost control of her car. It left the roadway and was wrecked—the radiator caved in, the hood telescoped, the engine broken, the front axle bent, the windshield broken and the steering wheel wrenched loose. Miss Brandon was lifted from the wrecked car and placed in an ambulance and taken first to the home of her sister, and later to a hospital, for examination. She was a large woman, weighing over 200 pounds, and was 62 years old. It was found that she had a cut on her forehead and under her chin, her left forearm was bruised, her chest was injured, and her right leg and knee bruised and "seemed paralyzed." She appeared to be in extreme pain over these affected areas. Following her visit to the hospital, Miss Brandon was taken back to her sister's home in Leavenworth, where she died on March 10, the third day after her accident.

The defendant company declined to pay the policy on the contended ground that Miss Brandon did not meet her death on account of her automobile accident, "directly and independently of all other causes," and that her death was chiefly induced by heart disease. This defense was predicated on the death certificate prepared and certified by the attending physician to the vital statistics division of the State Board of Health. It recited:

"The principal cause of death and related causes of importance in order of onset were as follows: Organ—heart disease.

"Contributory causes of importance not related to principal cause: Shock from auto accident March 7, 1937.

"Manner of injury: Auto accident.

"Nature of injury: Crush—wounds, chest and body."

In the proof of loss the same physician had filled out the pertinent questionnaire thus:

"6. State fully the cause of deceased's death. A. Organic heart disease. Complicated by severe injury in auto accident.

"7. Describe the condition of deceased at time of your first visit after the injury. A. Great shock. Contused and lacerated wounds over head and body.

"8. State what outward and visible signs of bodily injury you discovered at the time of your first visit to the deceased after the injury and give a full description of the injury. A. Contused and lacerated wounds of head, arms and body.

. . . . . . . . . .

"11. What disease or cause, other than the injuries above described, contributed to produce death? A. Heart condition.

. . . . . . . . .

"13. Did the injury, of itself, independent of all other causes, produce the death of the deceased? A. No."

The cause was tried before a jury. The evidence for the plaintiff beneficiary tended to show that Miss Brandon had been fatally injured in the automobile accident on Sunday morning, March 7, 1937, although she did not die until the following Wednesday. The physician who had attended her, and who had also been her medical adviser a year or two previously, testified: .

"I think that her death was due to embolism, a blocking of the coronary arteries, that is, a blocking caused by a clot of blood that was loosened from the . . . right knee, from this badly bruised condition."

This physician was subjected to a critical cross-examination. In part, it reads:

"Q. Why didn't you say that in making your death certificate? A. I did not think it was necessary to go into detail in the thing. I told the cause of death. That is all that is required of me.

"Q. Do I understand your testimony to be your opinion as to the cause of her death now, has not changed from the way indicated in your death certificate? A. No, not at all.

. . . . . . . . . . .

"Q. But you did not say anything of the fact her death was caused by a blood clot at the time you made your death certificate? A. I did not specify it; no. I did say it was due to this condition.

"Q. You told this gentleman who represented the Federal Life Insurance Company her death was due to a chronic heart disease? A. I did not.

. . . . . . . . . .

"A. . . . I told him a year before she had this attack of grippe and I saw her something like six or eight times at that time, and I had given her medicine for it. . . .

"Q. Didn't you tell him, as a matter of fact, her death was due to chronic heart disease? A. I did not.

"Q. And also told him the heart was—the condition was indicative to you she died with this heart disease? A. Absolutely not. . . .

"Q. At the time you made that certificate you made it from your best judgment at that time as to the cause of her death? Is that true? A. Yes."

The jury returned a general verdict for plaintiff and answered three special questions touching the literal recitals of the death certificate, about which there could be no dispute. A fourth special question was answered thus:

"(4) Do you find from the evidence that the cause of decedent's death was organic heart disease? A. Yes, organic, but not chronic."

Judgment was entered for plaintiff, and defendant assigns error in the admission of the testimony of the attending physician to modify or controvert the certificate of death.

To this point there are several answers. The recitals of the death certificate are not sacrosanct. They are merely prima facie evidence of the cause of death. So reads the statute. (G. S. 1935, 65-144.) "Prima facie evidence" is simply a *first view* of the evidence which will serve the purpose of the litigant who brings it before the court to establish his cause of action or defense sufficiently on which to base a judgment, if no further and better evidence than that *first view* is adduced by his adversary. Thus in *Shamlian v. Equitable Accident Co.*, 226 Mass. 67, 115 N. E. 46, the action was to recover on an accident insurance policy. Payment was resisted on the ground that the insured did not meet his death by "external, violent and accidental causes." The official record of the death on file with the city clerk, prepared by the medical examiner of the district, was to the effect that the death had been caused by external violence. The statute provided that this record "shall be prima facie evidence . . . of the facts." The admission of a certified copy of this record at the trial was complained of on appeal. But the supreme judicial court said:

"Although the record is prima facie evidence of the facts recorded, it determines 'the verdict or finding only if no other evidence is introduced. If any evidence is introduced to controvert the facts recited in the record, then the case is to be determined upon all the evidence, including the prima facie evidence. (Citations.)" (p. 70.)

In the case of *McGinty v. Brotherhood of Railway Trainmen*, 166 Wis. 83, 164 N. W. 249, payment of a life insurance policy was resisted on various grounds, one of which was the alleged falsity of the warranted answers given by the assured in his application. The evidential significance which should be given to the death certificate was drawn in question. The pertinent section of the syllabus reads:

"A physician's certificate of death being a matter of public record, its contents are not to be treated as privileged; being but prima facie evidence of the facts stated therein, it is subject to contradiction by proof as to the real facts

concerning the death; and the physician who made it may testify as to such facts." (Syl. ¶ 10.)

In the opinion it was said:

"The certificate of death of the father, Michael McGinty, made by Doctor O'Neill, stated that the cause of death was an injury to the head. Such certificate is presumptive evidence of the cause of death under section 4160, Stats., and the term 'presumptive' as there used has the same significance as what is designated as prima facie evidence under section 1022-12, statutes. Such certificate becomes a public record. Its contents are published to the world and are no longer treated as privileged. (*State v. Pabst,* 139 Wis. 561, 592, 121 N. W. 351.) It being but prima facie evidence of the material facts stated therein, it was subject to attack and subject to proof as to what were the real facts concerning the death. The doctor, therefore, who had made such certificate should have been permitted to testify, if such was the fact, that the injury to the head, referred to in the certificate as the cause of death, was a cancer." (p. 91.)

In his cross-examination, the doctor who certified Miss Brandon's death to the state board of health testified that he did not regard his oral evidence as inconsistent with the recitals of the death certificate. Be that as it may, since no heir-at-law or personal representative objected, the oral testimony of the physician was clearly admissible under our practice. (*Gorman v. Hickey,* 145 Kan. 54, 62, 64 P. 2d 587.) Counsel for defendant cites respectable precedents to the contrary, whose reasoning is based on other considerations than that of professional privilege. But whatever the reasoning, it does not commend itself to our judgment, chiefly because, as we said in *Bruington v. Wagoner,* 100 Kan. 10, 16, 164 Pac. 1057, "this court is rather positively committed against any interpretation of rules of evidence which limits judicial inquiry in the ascertainment of the truth."

Another error is based on the overruling of defendant's motion for judgment *non obstante veredicto.* Defendant has a talking point under this assignment, based on the jury's special finding No. 4. But we have often held that before a jury's special findings can be held to overthrow the general verdict and justify a judgment on the special findings, it must appear that they cannot be reconciled with the general verdict and that they are sufficiently full and complete in themselves on which to base a judgment. (*Riggs v. Ash Grove Lime & Portland Cement Co.,* 131 Kan. 244, 246, 289 Pac. 410.) Here we do not discern any fundamental discrepancy between special finding No. 4 and the general verdict. The judgment is therefore affirmed.