No. 33,825

MARGARET PROTHEROE and J. C. DAVIES (otherwise known as JACOB DAVIES), *Appellants*, v. DAN DAVIES (otherwise known as DAN I. DAVIES) and MABLE DAVIES, His Wife; MARY JONES and W. W. PARKER, Executor of the Estate of Mary Davies, Deceased, *Appellees*.

(89 P. 2d 890)

Opinion filed May 6, 1939.

*A. K. Stavely*, of Lyndon, *I. T. Richardson, Owen S. Samuel* and *Everett E. Steerman*, all of Emporia, for the appellants.

*Harry W. Colmery, A. C. Backus*, both of Topeka, *O. R. Stites* and *W. W. Parker*, both of Emporia, for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action to contest the validity of the last will and testament of the late Mrs. Mary Davies of Osage county. The will was admitted to probate and this action followed:

Plaintiffs are a daughter and son of the testatrix. Defendants are another son and daughter, and the third defendant is the executor named in the will. One son's wife is also a defendant.

It is necessary to an understanding of this lawsuit to narrate some matters of family history which appear in the record. The late David O. Davies and Mary Davies, his wife, came from Wales, and settled in Osage county many years ago.. They accumulated 1,000 acres of land, which was held in David's name. They reared a family of four children—Mary, Jacob, Margaret and Dan. One of their farms was called the old home place. About 1900, however, a new farm home was established on another tract of land, and on it Mr. and Mrs. Davies resided until 1923, at which time David's mind became deranged. At first he was taken to a hospital in Emporia, but later was confined to the Topeka state hospital. He never recovered his sanity, and died in 1930. During the long period of David's incapacity, his two sons, Jacob and Dan, were the guardians of his estate, and W. W. Parker, one of the defendants, served them as attorney from 1923 to 1930. Following the father's death, Jacob and Dan were appointed administrators of their father's intestate estate, and in that capacity Parker continued to act as their attorney until the estate was settled and closed on July 19, 1932. The Davies' lands were amicably divided pursuant to the advice and supervision of E. H. Rees, an Emporia attorney, who spoke the Welsh language and enjoyed Mrs. Davies' confidence. In this amicable division, the mother received about half the value of her husband's estate and the four children the other half. In this apportionment of lands the mother received the new home place of 140 acres and 240 acres of other land. Each of her children received certain tracts of land and gave her their several notes for various amounts agreed upon to equalize the estimated value of the lands apportioned to them and to satisfy various items of debts they owed their father's estate, thus:

Jacob and Dan got 320 acres jointly, and Jacob gave his mother his interest-bearing note for $2,260, and Dan gave his mother his similar note for $3,000.

Mary (Mrs. W. O. Jones) got 160 acres and gave her mother her interest-bearing note for $220.

Margaret (Mrs. I. H. Protheroe) got the old family homestead of 140 acres, and gave her mother her interest-bearing note for $600.

It was conceded in this lawsuit, and so found by the trial court, that this family settlement and division of the father's lands was fair and satisfactory to all concerned. The requisite instruments to effect that settlement were executed and exchanged in June, 1932.

The agreed value of each child's share was $5,380, and on that basis the mother's share was $21,520. It is that share which in its turn became the estate of the mother and which is involved in this contest of the mother's will.

At the time of the family settlement the mother was seventy-five years old. She occupied two downstairs rooms of her farmhouse with a hired attendant. She was crippled and could only get about with the aid of crutches or in a wheel chair. Occasionally she was taken for an outing in an automobile. Her native speech was Welsh, which she read and spoke readily. She was a woman of good intelligence and alert mind, but she read and spoke English with difficulty and understood it only if it was spoken slowly.

Her son Dan and his wife occupied the remaining portion of the mother's house. Dan operated his mother's farm, managed her affairs, and handled her bank account. He employed the succession of attendants who waited on his mother. At one time the mother had a separate telephone connection, but that was cut off, and her only practical means of communicating with her other children or friends was by means of her son's telephone which was not always convenient to use.

The daughter Margaret (Mrs. Protheroe) had an invalid son, the care of whom prevented her visiting her mother to some extent. Another reason for her infrequent visits was that her brother Dan was disagreeable toward her. On one occasion when she was at her mother's home he cursed her, saying, "Damn you, there is the road." While the testimony to that effect was disputed, the trial court expressly found it to be true.

Shortly after the family settlement of the father's estate, but before that estate was formally wound up in the probate court, it seems that in some way the mother signified to Dan or Jacob or to both of them her willingness to make a will, and that she wanted attorney E. H. Rees to draw it for her. In the small town of Reading, not far from the Davies properties, there was a bank operated by one D. Willis Jones. Dan Davies was a debtor of that bank. W. W. Parker, defendant herein, had been attorney for that bank. Dan did not want to carry out his mother's desire to secure Mr. Rees to draw her will. Jacob also held that attitude. He and Dan asked D. Willis Jones, the Reading banker, to draw their mother's will. They told him their mother wanted lawyer Rees to draw it, but that they thought Rees would favor their sister Margaret. Jones

declined to draw the will, and advised that they get W. W. Parker to draw it, and said he, Jones, would serve as an attesting witness.

Accordingly Jacob and Dan went to Emporia, some fifteen or twenty miles away, and called on Mr. Parker, and informed him that their mother wanted to make a will, that she wanted Mr. Rees to draw it, but that they desired Parker to come out and draw the will. Accordingly, on June 22, 1932, Parker went to the home of Mrs. Davies, accompanied by D. Willis Jones, the Reading banker. Parker drew some sort of will and he and Jones signed it as attesting witnesses.

Some three weeks later Jacob and Dan made another trip to Emporia. Dan called on Parker and told him his mother wanted to change her will. Parker agreed to come out again, and made a memorandum on his office calendar by writing "Davies" on a certain date. Jacob happened to call on Parker later in the day, and noticed the word "Davies" marked on the calendar and asked its meaning. Parker informed Jacob of what Dan had told him. On July 11 Parker and Jones, the Reading banker, again called on Mrs. Davies. On that occasion Jacob and Dan were both on hand. The evidence tended to show that the principal change to be made in this second will was in relation to the devise of the new home place. The first will seems to have devised a life estate in it to Dan, but made no provision for Dan's wife if she should survive him. Be that as it may, a second will was drawn and attested by Parker and Jones, the banker. In both the first and second wills Dan and Jake were named as executors. However, even this second will was not to stand for long. Within a few weeks Dan got Parker and Jones to come out to his mother's home a third time and draw and witness a third will. Jacob knew nothing of this third will. Margaret had been kept in complete ignorance of the making of all these wills. This third will is the one of present concern. It reads:

"I, Mary Davies, of sound mind and memory and desiring to so dispose of my property that my estate may be divided fairly among my children, do now make, publish and declare this to be my last will and testament, hereby revoking all others.

"1. It is my will that I direct that there be first paid out of my estate all my just debts, doctor bills and funeral expenses;

"2. I have four children, i. e., Mary Jones, Jake Davies, Margaret Protheroe and Dan Davies, and we have heretofore made a division of the estate of their father, and I desire by this will to make a fair division of my estate among my said children; and in said property settlement I took and will at my death probably hold notes from each of my four children, and for the

purpose of disposing of said notes it is my will and I direct that at my death that if my said children shall have paid the interest on their respective notes to the time of my death, that all of said notes shall be delivered back to said respective makers as a part of their distributive share of my estate.

"3. It is my will and I hereby give, devise and bequeath my home place, being 140 A. of the NE.¼ of sec. 12, twp. 18, R. 13, Osage county, Kansas, to my son Dan I. Davies for his use and benefit for and during his lifetime only, and at his death I will, devise and bequeath said home place of 140 A. to the living issue of said Dan I. Davies, except that in the event of the death of my said son Dan I. Davies without issue it is my will and I give, devise and bequeath said home place of 140 A. to my daughter-in-law (wife of said Dan Davies), Mable Davies, for her use and benefit for and during her lifetime or until she remarry. And it is further my will that in the event of my son Dan I. Davies' death with issue of his body, that upon the death of his said wife if she survive him, or if she remarry, that it is my will and I give, devise and bequeath my said home place of 140 A. to the living issue of my other three children, Mary, Jake and Margaret, share and share alike, to said grandchildren so living.

"4. It is my will, and I give, devise and bequeath to my daughter Mary Jones the S.½ of the NW.¼ of sec. 18, twp. 18, R. 13, Osage county, Kansas; and I give, devise and bequeath to my son Dan I. Davies the N.½ of the NW.¼ of sec. 18, twp. 18, R. 13, Osage county, Kansas: *Provided,* My said children Mary and Dan shall each pay my son Jake the sum of $200, and said devise to become effective upon the payment of said $200 by each of said two children.

"5. It is my will, and I give and devise all my household goods and personal belongings to my two children Mary Jones and Dan [I.] Davies, share and share alike.

"6. All the rest, residue and remainder of my estate, except the said real estate herein devised and said household goods and personal belongings as herein devised, I hereby give, devise and bequeath to my four children, share and share alike, including cash, rents and securities, the full names of my said four children being: Mary Jones, Jacob C. Davies, Margaret Ann Protheroe and Dan I. Davies.

"7. It is my will, and I hereby give, devise and bequeath to my son Jacob C. Davies the W.½ of the NE.¼ of sec. 9, twp. 18, R. 13, Lyon county, Kansas.

"8. It is my will and I select and ask the court to appoint W. W. Parker, of Emporia, Kansas, as executor of this will in the settling of my estate.

"In witness whereof I have signed this my last will and testament this September 3d, 1932. MARY DAVIES

.    .    .    .    .    .    .    .    .    .    .

"W. W. PARKER, Emporia, Kansas
D. WILLIS JONES, Reading, Kansas
[Witnesses.]"

Two years later Mrs. Davies died at the age of seventy-seven years. Following the probate of her will, this action to contest it was begun by Margaret and Jacob. Their petition pleaded facts

and allegations of fact which were summarized in paragraph 6 of their petition thus:

"That said written instrument aforesaid is not the valid will of the said Mary Davies, deceased; and that said testatrix, at the time of the making of said pretended and purported will, was under the restraint and undue influence of the defendant, Dan Davies. . . ."

Defendants Dan Davies and wife, and Mary Jones, sister of Dan, filed an answer making admission of certain matters not prejudicial to their interests and joining issue on the other matters pleaded in plaintiffs' petition. Defendant Parker, as executor, filed a separate answer containing a general denial.

At the trial the facts were developed at length as outlined above. Other incidents should be mentioned. It was brought out that Parker did not charge Mrs. Davies for his three trips to her home or for drawing her will three times. Being questioned on this point by the court, he testified:

"By the Court: . . . These times you were out there and drew these wills, were you paid for it? A. No, sir.

"Q. Was there anything said about your being paid for these trips you had been making? A. No, I don't believe there was.

"Q. Well, did you later make a charge for it? A. I never did.

. . . . . . . . . . . . . .

"By the Court: Why weren't you paid? Why didn't you make a charge?

"A. I had had a pretty liberal pay as attorney for the guardians and pretty liberal pay as attorney for the administration.

"Q. You didn't intend to make any charge then? A. No, sir."

Elsewhere Parker's testimony developed the fact that the administration of the father's estate was not completely wound up until July 19, 1932. His testimony reads:

"[Counsel for defendants]: After this [family] settlement had been agreed to between the heirs of the father's estate, did Jake and Dan come into your office with reference to the making of the final accounting in their father's estate? A. Yes, sir.

"Q. Do you know about when that was? A. It was the fore part of June, 1932.

. . . . . . . . . . . . . .

"Q. You did make the final accounting and the father's estate was closed, I presume? A. Yes, sir. I will have to explain there. We had to make up an accounting on the final blank sheets and forward it to the probate court. We later had the hearing on that and for allowance of fees, and so forth, so that it was considerable time after this first time when they came in to make up the accounting before the discharge."

Parker also testified that in all the wills he wrote, it was at Mrs.

Davies' expressed wish that he inserted at two different places—in the preliminary recitals and in paragraph 2—that she desired that her estate be divided fairly among her children. He also testified the testatrix told him she "didn't want Margaret to have as much as the others, because she thought Margaret had gotten the best of the settlement when they settled the father's estate."

In the examination of Parker it was brought to light that he did not write that part of Item 3 of the will which disposed of the remainder estate in the home place as the testatrix had directed him. According to his testimony she told him what should be done with that remainder after the death of Dan and Dan's wife in the event Dan died without issue. He wrote this provision as it appears in the will, which directed to whom that remainder estate should pass if Dan died with issue. Parker testified that he read this paragraph of the will to Mrs. Davies twice, once by itself and again when he read the will to her as a whole, but that in each instance he read it erroneously and not as he had actually written it. The record reads:

"Q. Do you think now that this third will correctly expresses her intentions and desires and her wishes? A. I think it correctly expressed her wishes as we obtained them that day.

"Q. And in going over this will as it was written, you read it to her paragraph by paragraph, as you wrote it? A. Yes, sir.

"A. I want to correct a statement, you just asked me, 'do I think the will as it now stands was the way she wanted her property disposed of that day?' I want to make this correction. In the writing of the will we left out or wrongly wrote one word which changes the meaning as to the issue of Dan. "By the Court: Show me that, on the will. Where is the will?

"By the Court: Where is this word? A. 'In the event he die "with issue."'

"By the Court: That would change the whole disposition of the final fee of this property. A. Yes, sir.

"[Counsel for plaintiffs]: Do you say when you wrote this third paragraph in which this word was found 'And it is further my will that in the event my son, Dan I. Davies, die with issue of his body that upon the death of his said wife if she survive him or if she remarry, then it is my will and I give, devise and bequeath my said home place of 140 acres to the living issue of my other three children, Mary, Jake and Margaret, share and share alike to said grandchildren so living,' you read that to her and she said that is the way she wanted it, didn't she? A. I can't answer that 'yes' or 'no.'

"Q. Yes you can. I asked if you didn't read the first paragraph to her,

and asked if that is the way she wanted it, and then the second and so on. Did you read it to her the way that it is in there? A. No, sir.

"Q. Why do you say you didn't read it to her as it is written here? A. Because that wasn't the way she wanted it; that wasn't the way I intended to write it; that wasn't the way I read it to her; that wasn't the way she directed me to write it.

"Q. Are you saying to the court you sat there and wrote this down and having that before you, that you read it differently than it appeared on this paper? A. Evidently, I did, sir.

"Q. And you read it to her twice differently than it was written? A. Evidently, I did, sir.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"By the Court: I understand this is testimony concerning the execution of a will and what was done. It is not a question of construction."

Parker also testified that on each of the three occasions he called on Mrs. Davies to write her three successive wills, that in each she told him, "she didn't want Margaret to have as much because she had had an advantage in the division of the father's estate."

"Q. She said that on the occasion of the first will? A. That in substance.

"Q. And said that on the occasion of the second will? A. Yes.

"Q. And said that same thing on the occasion of the third will? A. In substance, yes, sir."

Other witnesses testified to statements the testatrix had repeatedly made both before and after the making of the third will to the effect that she wanted her children to share her property equally. A cousin of the testatrix, called as a witness for defendants, testified on cross-examination that Mrs. Davies told her she thought "there had been a fair settlement of the father's estate."

The deposition of Alma Clark, who had been Mrs. Davies' personal attendant for several months in 1933, was taken in California. She testified that Mrs. Davies was frequently in distress and tears following conversations with her son Dan. She complained that she didn't seem able to dispose of her property to satisfy her children. On one occasion, according to the deponent's testimony:

"She was very much disturbed after a certain conversation between her and her son. She said she wasn't satisfied with the attorney that they had. She wanted very much to have Mr. Rees instead of Mr. Parker. She had Mr. Parker and she told me—she told me that she was very much—she very much disliked Mr. Parker. That was the first day she told me after a conversation she was feeling very bad and was very much upset, and I asked her why? and she said against her wishes they had hired Mr. Parker as attorney.

"[Counsel for plaintiffs]: Did she say why she wanted Mr. Rees? A. She seemed to be able to understand Mr. Rees.

"Q. He could speak the Welsh language? A. Yes, sir."

Elsewhere Miss Clark's deposition reads:

"Q. Now, did Mrs. Mary Davies go driving in an automobile at all? A. She went once while I was there.

"Q. With whom did she go?

"A. Jernigan. Mrs. Mary Jones and Pearl, her daughter and Agnes, those were the ones in the party when we went.

"Q. What did Mrs. Mary Davies say, if anything, with reference to any of her property? A. She was telling us and showing us the land that Mrs. Protheroe was to have. . . . It was eighty acres, I think. She told us about which she was to have. . . . We stopped there and she looked at the cattle that were in the pasture. It was pasture land.

"Q. Was there any house on it? A. No, sir.

"Q. She told you at that time that was the piece of property that she intended to give to Margaret, her daughter?

"[Counsel for defendants]: Object, leading, suggestive.

"By the Court: Overruled.

"A. Yes, sir."

At the conclusion of the trial plaintiffs requested thirty-eight findings of fact, which the court declined to adopt, but it did make thirty-three of its own, which cover some ten printed pages of the abstract. To hold this opinion within reasonable compass these findings cannot be included herein, but they will be noted wherever necessary as we proceed. The trial court's conclusions of law read:

"1. In deciding this case the court overrules all objections made to declarations of the testatrix, Mary Davies, testified to by competent witness, but in its decisions of the case the court only considers the declarations of said testatrix made prior or subsequent to the execution of the will in question, upon the question of the state of mind of said testatrix towards her children at and before the time she executed the will in suit.

"2. This is not a case to construe the will of Mary Davies nor to determine rights or particular beneficiaries in property devised by it; but it is a case brought by the plaintiffs to set aside the will of Mary Davies and the probate thereof, on the ground of undue influence exercised by the defendant Dan I. Davies upon Mary Davies which caused the will in question to be executed by her.

"3. The will in question having been duly probated is presumed to be valid, and that in the execution thereof Mary Davies was not under restraint or unduly influenced to execute said will.

"4. The burden of proof in this case is upon the plaintiff to overcome such presumption and to prove by substantial evidence that the will in question was the product of the undue influence of Dan I. Davies.

"5. The court concludes and finds that such presumption has not been overcome and that the plaintiffs have failed to prove by preponderance of the

evidence that the will in suit was executed by Mary Davies because of undue influence exercised upon her by Dan I. Davies.

"6. Judgment should be rendered and entered in favor of the defendants for costs."

From this judgment plaintiffs appealed, urging a procedural error, also error in the findings of fact given and refused, and in the general result.

Touching the findings of fact based upon the testimony of witnesses who appeared before the court, we follow the ordinary rule giving credence where the trial court gave credence, and ignoring such testimony where the trial court rejected it. (*Gilpin v. Burch,* 145 Kan. 224, 65 P. 2d 308.) Where the testimony was by deposition, we are, of course, in the same position as the trial court and have our own responsibility touching the credence to be accorded it. (*Record v. Ellis,* 97 Kan. 754, 760, 156 Pac. 712.) The trial court's 33d finding of fact needs special attention. It reads:

"Mr. W. W. Parker, in the execution of the first will, was not selected or named by Mrs. Davies to draw her will, but was selected by Dan and Jake Davies for that purpose, but when he appeared to draw her will she approved of him as a proper person to draw her will."

This finding that Mrs. Davies approved of Parker as a proper person to draw her will was an inference arising from the fact that he did draw it. We think that inference was overthrown by the evidentiary circumstances and by the deposition of Miss Alma Clark.

We are inclined to think that the trial court may have attached too much significance to the fact that the will had been admitted to probate. The statute says that fact shall be prima facie evidence of its genuineness. (G. S. 1935, 22-224.) But the same statute authorizes a judicial contest of the will; and the gist of such a contest is to get behind the prima facie evidence to discover, if possible, the true facts of its validity.

" 'Prima facie evidence' is simply a *first view* of the evidence which will serve the purpose of the litigant who brings it before the court to establish his cause of action or defense sufficiently on which to base a judgment, if no further and better evidence than that first view is adduced by his adversary." (*Kirsch v. Federal Life Ins. Co.,* 149 Kan. 309, 312, 87 P. 2d 591.)

However, insofar as this lawsuit turned upon the issue of undue influence, the pertinent evidence being given largely by oral testimony before the trial court, its judgment thereon cannot be disturbed.

But does this conclusion dispose of this appeal? By no means.

The first alleged ground on which plaintiffs based this action to contest the will was "that said written instrument aforesaid is not the valid will of the said Mary Davies, deceased." The trial court adopted the view that this simple, straightforward allegation of fact was involved only as it might be related to the issue of undue influence. To overcome that viewpoint counsel for plaintiffs asked leave to amend their petition to conform to the proof. This was denied, apparently on the theory that it would amount to a change in the cause of action—after the period of one year which the statute allows to begin an action to contest a will. We cannot assent to that view. We think the pleading was quite sufficient to raise the issue whether the instrument admitted to probate was or was not the valid will of Mrs. Davies. (1 Page on Wills, 2d ed., §§ 559, 565.) It is not even good pleading to elaborate in the petition what evidence may be adduced at the trial; and not infrequently probative facts of the most convincing sort are wrung from the reluctant lips of adverse witnesses, of which the pleader had no inkling when he drew his petition. Moreover, any mere amplification of a pleading does not change the cause of action. (*Wilber v. Ronnau,* 82 Kan. 171, 107 Pac. 772; *Vanderwerken v. Marks,* 138 Kan. 42, 23 P. 2d 608.)

Addressing ourselves, therefore, to the question whether the probated instrument was the valid will of the mother of these litigants, we commence with the significant fact that she wanted E. H. Rees, the Emporia lawyer who enjoyed her confidence and with whom she could talk freely in her own native tongue, to draw her will. Her sons frustrated that desire and got a lawyer who was then actually in their own employment to go to Mrs. Davies' home uninvited to draw her will. The first will was drawn on June 22, 1932, and the second will was drawn on July 11, while the administration of the father's estate, in which the scrivener of this will was attorney for Dan and Jake as administrators, was not closed until July 19, 1932, and the trial court made a specific finding to that effect. It is therefore clear that the first and second wills were drawn by a scrivener who was then actually in the employment of Dan and Jake Davies, and not in the employment of their mother. And whatever compensation he got for his three trips from Emporia to the Davies homestead and for his services as scrivener came out of the father's estate, of which Dan and Jake were administrators. There was no material change in the relations of the scrivener and Dan after the closing of the father's estate on July 19, except that a more exclusively con-

fidential relationship arose between them, seeing that they maneuvered Jake completely out of the picture when at Dan's instance and unbeknown to Jake the scrivener and his fellow-attesting witness returned to the home of Mrs. Davies to draw a third will for her on September 3.

The declared intention of the testatrix, as stated in the preliminary recitals of the will, was that she desired that her "estate may be divided fairly" among her children; and in paragraph 2 the will reads:

"I have four children, i. e., Mary Jones, Jake Davies, Margaret Protheroe and Dan Davies . . . and I desire by this will to make a fair division of my estate among my said children . . ."

Following that clearly and repeatedly declared intention, the will disposed of the lands of the testatrix, which constituted much the largest part of her estate, thus:

To Dan: Life estate in the new home place, 140 acres (item 3). Another 80 acres (item 4)—subject to a charge of $200.

To Mary: 80 acres (item 4)—subject to a charge of $200.

To Jacob: 80 acres (item 7) plus $400 as charged against the 80-acre devises to Dan and Mary.

To Margaret: Nothing.

The mother's personal estate consisted chiefly of the promissory notes she had received from her children. These (subject to a condition we cannot now consider) she bequeathed as follows:

To Dan: $3,000.

To Jacob: $2,260.

To Mary: $220.

To Margaret: $600.

The household goods and personal belongings of the testatrix were disposed of thus:

To Dan: One-half.

To Mary: One-half.

To Jacob: Nothing.

To Margaret: Nothing.

How does such a grossly unfair division of the mother's estate correspond with her twice-declared intention in the same instrument? It is altogether beside the point to argue that the mother, for any reason, good, bad or indifferent, or for no reason whatsoever, could make any disposition of her estate she chose to make—give it all to one, give nothing to the others, or give it all to strangers. Our

present concern is whether this instrument, under scrutiny, faithfully set down on paper the mother's actual testamentary intention. The disparity between the declared intention of the testatrix and the devises and bequests which follow that declaration must be given probative significance.

On behalf of defendants there was much testimony to the effect that the mother desired that Dan should have the home place or at least a life interest in it when she died. While the record tends to show that the home place was the most valuable of the mother's properties—a very expensive barn had been built on it at the expense of the father's estate at the instance of Dan and Jake as administrators—such a desire would be quite natural for the mother to entertain. Mary, Jake and Margaret had homes of their own while Dan had none. But in all this testimony evidencing the mother's desire that Dan should have the home place, there was not a scintilla of evidence that in addition to the home place he was to get half the mother's household goods and personal belongings, together with the release and cancellation of a $3,000 indebtedness owed her and another eighty acres thrown in for good measure! And while the particular eighty acres which the mother showed to Alma Clark saying, "That is the eighty that Margaret is to have," is not identified in the record as the extra eighty acres which, by the challenged will, is devised to Dan, it is inferable from all the evidence that such was the fact. The credence to be given to Alma Clark's testimony on this matter, being by deposition, is this court's own responsibility (*Lytle v. Wade*, 129 Kan. 671, 678, 284 Pac. 411; *Mohr v. Women's Benefit Ass'n*, 131 Kan. 132, 134, 289 Pac. 476; *Stevens v. Myers*, 134 Kan. 286, 5 P. 2d 802). To withstand Miss Clark's testimony the defendant Mrs. Mary Jones testified that she drove the automobile on that occasion and that six persons were riding in it. She first testified that some such conversation took place, but later said she did not hear her mother make the statement testified to by Miss Clark, and although she admitted she did not listen to all of that conversation she was positive her mother did not make it. The daughter of Mrs. Mary Jones testified that she too was one of that automobile party and did not hear her grandmother make the statement. She testified that on that automobile trip her grandmother was not talking about the land at all, and never said anything about land. In this respect the oral testimony of mother and daughter, both witnesses for defendants, was mutually

contradictory and should not be held to destroy the probative force of Miss Clark's deposition touching what the testatrix said about the tract of land Margaret was to get.

Even the testimony of the scrivener that the mother thrice told him "she didn't want Margaret to have as much as the others"—giving that testimony most generous credence, it fairly implied that the mother intended that Margaret was to get at least some portion of her lands, but this purported will did not give her a single acre.

Turning next to the testimony of the scrivener touching the discrepancy between what the testatrix directed him to put into the will concerning the remainder estate in the home place after the expiration of a life estate to Dan and the expiration of a life estate in favor .of his wife if she survived him and remained his widow, it is not of much consequence in this lawsuit whether in an action to construe the will the words *with issue* should be read *without* issue. We have no present concern with that mere matter of construction. But the facts testified to by the scrivener concerning the circumstances under which that discrepancy occurred have a vital bearing on the matter of present concern, which is whether this instrument was the valid will of Mrs. Davies. The scrivener admitted he did not write that provision as Mrs. Davies directed. He admitted that he misread it to her twice. Did not these startling admissions of the scrivener place a capsheaf on the evidence marshaled to prove that the contested instrument was not the valid will of Mrs. Mary Davies?

In *McConnell v. Keir,* 76 Kan. 527, 531, 92 Pac. 540, it was said, "It is necessary to the validity of a will that the testator know the contents thereof at the time he signs it." It is a general rule of law that where a will is not written in accord with the testator's intentions the will fails.

In *Bradford v. Blossom,* 207 Mo. 177, 107 S. W. 289, the first two sections of the syllabus read:

"1. A will that does not dispose of her property as testatrix desired and directed, cannot stand.

"2. If the old and deaf and frail, but unusually bright and intelligent testatrix directed her agent to have her will drawn in one way and he had it drawn in another, and she signed it under the belief that it was written as she had directed, it was not her will."

In *Waite v. Frisbie,* 45 Minn. 361, 47 N. W. 1069; id., 48 Minn. 420, 51 N. W. 217, the scrivener omitted a provision the testatrix desired; thereupon an addition was made which the testatrix was

told effected the desired provision, but which did not do so. The clause as written was not read to her, nor did she read it herself, but she signed it. It was held that the contested instrument was not her will.

In *Cowan v. Shaver,* 197 Mo. 203, 95 S. W. 200, it was held that an instrument which contained a different disposition of the testator's property than the one he had directed could not be adjudged to be his will. In the opinion the court said: "It is immaterial what the scrivener thought about it, if the illiterate, feeble old man [the testator] told him to write it one way and he wrote it another, and it was signed under the belief that it was written as he directed, it is not his will." (p. 213.)

In *In re Estate of Kempthorne,* 188 Ia. 70, 175 N. W. 857, the will gave a life estate to the testator's widow, and three-tenths of the remainder to be placed in a trust fund for the benefit of a daughter for life and then to her children. The daughter had been divorced and the testator desired to prevent the divorced husband from the possibility of his inheriting any portion of the testator's property by devolution from one of the testator's grandchildren. Probate of the will was denied on the ground that it did not express the testator's intention. The district court took another view, but on appeal the supreme court held that since this single feature of the will was not drafted as the testator intended, the denial of its probate was sustained.

See, also, *Sansona v. Laraia,* 88 Conn. 136, 90 Atl. 28; *Hildreth v. Marshall,* 51 N. J. Eq. 241, 27 Atl. 465.

The foregoing decisions are in accord with the rules of the textbooks and cyclopedias. In 68 C. J. 606 it is said:

"It is indispensable to the validity of a will that the testator should know its contents at the time of its execution."

In 68 C. J. 984-986 it is said:

"The presumption that a person signing a written instrument knows its contents and nature applies to wills . . . but such presumption of knowledge readily yields to evidence tending to show the contrary or to excite the suspicion of the court, and so it is defeated where . . . its contents were misrepresented to him, or his directions concerning its preparation were not followed. . . ."

See, also, 1 Schouler on Wills, 6th ed., p. 303 *et seq.;* Thompson on Wills, 2d ed., p. 179 *et seq.;* annotation in 16 British Ruling Cases, 1006-1031.

To summarize: The frustration of Mrs. Davies' wish to have an attorney of her own choosing to draw her will, in whom she had confidence and with whom she could converse readily in her own language, the fact that the respective devises were so greatly at variance with the declared intention of the testatrix in the will itself and as made by her both before and after the making of the will, the fact that the will as written did not conform to the directions of the testatrix and was twice misread to her by the scrivener before she signed it—these considerations compel this court to hold that it affirmatively appears that the contested instrument was not the valid will of the said Mary Davies, deceased.

In our protracted perusal of this record we could not shut our eyes to the fact that the scrivener who was also an attesting witness and was named as executor, and who has served throughout this lawsuit as attorney for defendants, also volunteered as a witness and gave testimony on matters of vital concern in the cause, not merely on formal matters. This is a practice disapproved by the Canons of Professional Ethics. (144 Kan. xi, No. 19. See, also, *State v. Ryan*, 137, Kan. 733, 22 P. 2d 418; *Earhart v. Tretbar*, 148 Kan. 42, 80 P. 2d 4.)

The judgment of the district court is reversed and the cause is remanded with instructions to enter judgment for plaintiffs.

ALLEN, J., dissents.