No. 39,213

In re Estate of Lona Grisell, Deceased. (BASIL C. MARHOFER, *Appellee*, v. RAY N. MARHOFER and ORRIS W. MARHOFER, *Appellants*.)

(270 P. 2d 285)

Opinion filed May 8, 1954.

*James A. McClure*, of Topeka, argued the cause, and *Robert L. Webb, Ralph W. Oman, Philip E. Buzick, Robert A. McClure*, and *James D. Waugh*, all of Topeka, and *Ernest J. Deines* and *William Wagner*, both of WaKeeney, and *Ray McCombs*, of Ness City, were with him on the briefs for the appellants.

*W. D. Jochems*, of Wichita, argued the cause, and *J. Wirth Sargent, Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, S. C. Durbin, J. Francis Hesse, James W. Sargent*, and *Stanley E. Wisdom*, all of Wichita, and *John A. Etling* and *W. N. Beezley*, both of Kinsley, and *Basil C. Marhofer*, of Ness City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: The probate court admitted a will to probate. Respondents, opponents of the will, appealed to the district court which on a trial *de novo* rendered the same judgment. Respondents have appealed. We shall refer to the parties as proponents and opponents.

The district court made findings of fact and conclusions of law which are appended hereto and made a part of this opinion.

The question presented is whether the will was revoked. Paragraph two thereof, as originally executed, read:

"Second. I give, devise, and bequeath all of my personal and real property of whatsoever nature and kind and wherever situated, to my nephews, Vernon Marhofer, Jr. and Basil Marhofer, equally."

Heavy penciled markings were later made over the names of the designated beneficiaries but the names remained discernible through the markings. The original and carbon copy of the will were each executed with all the required legal formalities. The will was ordered admitted to probate as originally typewritten.

The opponents filed a motion to strike certain findings of fact and conclusions of law three and four. Opponents state they are now complaining only of finding No. 11. They also appeal from the order overruling their demurrer to proponents' evidence, the orders excluding evidence they offered and to the order overruling their motion for a new trial. We shall first consider the order overruling their demurrer. The ground thereof stressed here is:

"Proponents have failed to prove, or overcome the presumption of revocation, which presumption is raised by the reason of the mutilations on the instrument which they have offered herein for probate."

The material portion of proponents' evidence, in substance, further disclosed:

The wills were executed in 1948; Fred Amstutz, cashier of the Ransom State Bank, was the scrivener; he and Mildred Clark, assistant cashier of that bank, witnessed the signature of the testatrix; the testatrix had a third nephew called Wayne or Duane; he is a son of Orris Marhofer, brother of the testatrix; the testatrix left one will in a locked box in the Ransom bank and took the other will with her; no names of beneficiaries were marked out at that time; in the fall of 1951 testatrix returned to the same bank and asked for her bank box, which Amstutz delivered to her; he saw her remove the will from the box; he testified there were no markings on the will at

that time although he did not say he opened and inspected it; Amstutz testified testatrix told him:

". . . she wanted to get the will because she wasn't satisfied with it; she wanted to destroy it, and maybe sometime make a new one."

Proponents' evidence further, in substance, discloses:

Testatrix left for Arizona in February, 1952, where she remained until her death on March 26, 1952; before leaving for Arizona she left some keys with Mrs. Ivy Sweasy, a friend of long standing; a short time after her death her friend gave the keys to Orris Marhofer; after her death Vernon J. Marhofer, Jr., one of the nephews named in the will, went to decedent's home with Ray and Olin Marhofer, brothers of the decedent; Ray had a key to the house; they found a locked trunk which they could not open; about a week later the same parties and Orris, the other brother of the decedent, returned to the house; Orris produced a key and unlocked the trunk and they examined its contents; it contained numerous keepsakes such as old linens, silverware and some papers; among them they found an envelope which contained both the wills; that was about two weeks after her death; they all looked at the wills; the wills were handed to Vernon, the nephew; he took them to Basil, the other nephew, and they delivered them to the probate court.

The opponents stress the statement Amstutz said decedent made to him when she got the will from her safety deposit box. They insist it indicated an intention to revoke the entire will and the mutilations disclose such intent was consummated. We agree the changes made indicate dissatisfaction with the will as originally executed. Whether what the testatrix did resulted in a legal revocation of the will is the question to be determined. The markings did not constitute a physical destruction of the will and she did not otherwise destroy it. Had she intended to destroy the entire will she easily might have burned, torn it or otherwise mutilated the instrument in its entirety, including her signature. She did not do any of these things. On the contrary she carefully struck out only the names of the two designated nephews in both wills. She did that in a manner indicating an intention to make the markings precisely the same on each will. She did not strike out the entire paragraph so as to indicate she intended not to leave her property to nephews. The will as changed indicates she intended to leave the property not to two of her nephews but to all three of them equally. As changed it reads:

"to my nephews, and equally."

Instead of destroying the instruments she preserved them. She placed them together in a single envelope. She put them into her locked trunk with other papers and valuable keepsakes. It is true she also said, according to Amstutz, that she might sometime make a new will. From the markings on the wills and the fact she preserved them it appears that, in all probability, is precisely what she erroneously believed she had effectively accomplished. Had she not thought so she probably would have had an attorney or some other scrivener draw a new will. Manifestly she was not too ill to go to an attorney for that purpose. She was able to go and did go to Arizona, leaving the instruments as indicated. These were all proper considerations in determining intent.

One of the most common mistakes of laymen is their belief that a will may be altered by striking out some provision therein or by substituting another to meet their changed desires. It is not so much the nature and extent of markings of cancellation or obliteration that govern as it is the present intention of a testator in making them that determines whether there has been a revocation of the will. (*In re Estate of Kemper*, 157 Kan. 727, 145 P. 2d 103.) So in the instant case we think, in view of all the circumstances, the district court was justified in concluding it was not decedent's intention to destroy or otherwise revoke her entire will. Under our statutes there cannot be a partial revocation of a will. (*In re Estate of Johannes*, 170 Kan. 407, 227 P. 2d 148.)

In view of what has been said the will was not legally revoked. G. S. 1949, 59-610 provides:

"If after making a will the testator marries and has a child, by birth or adoption, the will is thereby revoked. If after making a will the testator is divorced, all provisions in such will in favor of the testator's spouse so divorced are thereby revoked."

G. S. 1949, 59-611 reads:

"Except as provided in section 46 [59-610], no will in writing shall be revoked or altered otherwise than by some other will in writing; or by some other writing of the testator declaring such revocation or alteration and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself or by another person in his presence by his direction."

Statutory provisions for revocation of wills are mandatory. They must be strictly construed. A will can be revoked only in the manner provided by statute. (*In re Estate of Grattan*, 157 Kan. 116. 138 P. 2d 497; *In re Estate of Kemper*, supra; *In re Estate of Rinker*,

158 Kan. 406, 147 P. 2d 740; *In re Estate of Koellen,* 162 Kan. 395, 176 P. 2d 544; *In re Estate of Johannes,* supra.) The trial court found that instead of destruction there was reconstruction; instead of revocation there was alteration.

Having concluded the will was not revoked what was the legal effect of the alterations? The instrument as altered was not the will the testatrix executed. Not having been executed in compliance with legal requirements the altered instruments could not be admitted to probate as a last will and testament.

Did the testatrix die intestate? We do not think so. In 1 Bartlett's Kansas Probate Law and Practice, rev. ed., § 430, dealing with changes such as the instant one the rule is stated as follows:

"It follows in such cases that the failure of the testator to execute his purpose in the manner prescribed by the statute prevents it from going into effect as a testamentary disposition; and, as it is apparent that he had no intent to revoke except by way of alteration, if the word or words erased have not been so obliterated as to be illegible, there is no revocation, and the will remains intact as before." (p. 505.)

In our recent case of *In re Estate of Johannes,* supra, the principle here involved was fully discussed. We held:

"When partial revocation by burning, tearing, cancelling, obliterating or destroying a part or parts of a will is attempted, such revocation is innocuous and the will should be probated in its original form if the provisions as originally existing, but attempted to be revoked, can be determined from an inspection of the will itself or can be ascertained by extrinsic proof.

"Where a will otherwise executed according to law, but showing one paragraph thereof to have been obliterated, is offered for probate, probate should be allowed in its original form if the content of the obliterated paragraph can be determined by extrinsic proof." (Syl. ¶ 5, 6.)

In the instant case the names over which pencil markings were made were determinable through the markings. No extrinsic evidence was required to make them legible.

For the purpose of the demurrer the testimony, oral and written, and all reasonable inferences to be drawn therefrom are admitted. That, of course, includes the testimony of the proponents that decedent had a third nephew. The latter fact was testified to by one of her nephews, Vernon J. Marhofer, Jr., as follows:

"Q. Did Lona Grisell have any other nephews, other than you and Basil? A. Yes.

"Q. Who? A. Wayne or Duane; I am not sure.

"Q. Whose son was he? A. Orris.

"Q. And Orris was a brother of the decedent, Lona Grisell? A. Yes."

Opponents contend this evidence was insufficient to show when decedent had such a nephew or that she had such a nephew when she made the markings on the will. It seems to us that is a strained construction of the testimony when challenged by demurrer. It must be remembered the testatrix was dead at the time of the trial. Manifestly, the proper question to the witness at that time would not have been, "Does Lona Grisell have any other nephew?" Whether there were three nephews was a vital point in the lawsuit. The witness was not cross-examined relative to a third nephew. The fact there was a third nephew does not appear to have been questioned, much less disputed, in the proponents' case in chief.

Moreover, we also have noted that Orris M. Marhofer, one of the opponents of the will, is the father of the third nephew. Orris Marhofer testified in opposition to the probate of the will. He did not even remotely intimate he did not presently have a son by the name of Wayne or Duane. He possessed that important information and surely would have denied that testimony had it not been true. Under such circumstances it is presumed his testimony on the subject would have been unfavorable to his position as an opponent of the will. Failure of a party to throw light upon an issue peculiarly within his own knowledge or reach raises a presumption open to explanation, of course, that the concealed information is unfavorable to him. (*Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 106 P. 2d 652; *Henks v. Panning*, 175 Kan. 424, 430-431, 264 P. 2d 483.) Momentarily, however, we are concerned only with opponents' demurrer. Reasonable inferences to be drawn from the testimony of the proponents is that decedent had a third nephew.

The burden of proof to show revocation of a will is on the party asserting revocation. (*In re Estate of Rinker*, supra.)

Opponents contend there was no conflict in the oral testimony on behalf of the proponents and that this court therefore has the duty to pass upon that evidence as well as the trial court. Assuming that to be true the evidence was sufficient to convince the trial court and this court that decedent did not intend to revoke her entire will. The demurrer, therefore, was properly overruled.

We come now to the findings of fact. Opponents criticize only finding No. 11 on which they claim conclusion of law No. 3 is based. They contend that finding is based on a series of conjectures among which they include the testimony, previously discussed, that the decedent had a third nephew. We shall not repeat what was previously said concerning a third nephew. That fact was not a mere

presumption. The changes made in the will tend to indicate without further testimony that decedent desired to include all three of her nephews as beneficiaries. That fact is a reasonable inference to be drawn from all the circumstances and the testimony. It is not a bare presumption based on conjecture. Moreover, conclusion of law No. 3 finds support in the findings of fact other than finding No. 11. Furthermore, the alterations in the will of necessity indicate the testatrix deliberated and considered the changes she desired to make or she would not have made them.

We come now to opponents' contention evidence they offered was improperly excluded. The vice-president of the Arnold State Bank, another bank in which the testatrix did considerable business and in which she had an unlocked box, testified over proponents' objection concerning a conversation he had with the testatrix before she left on a trip to Arizona. That testimony was:

"She said, 'I should have a will. I must make one'; I said, 'That is fine. If I were you, I would go and see an attorney and have him make one for you.' She told me at that time that as soon as she got feeling better that that is what she would do, but she wasn't too well."

The court struck the last part of the statement that "she wasn't too well" on the ground it was not responsive to the question. The witness first stated the conversation occurred about ten days before testatrix left for Arizona but later testified it occurred sometime within sixty days before she left.

Another witness, who at times advised the testatrix relative to certain investments, testified concerning a conversation he had with the testatrix in December, 1951, before she left for Arizona, which was about the middle of February, 1952. That testimony was:

"In December, I asked if she had a will made out. She said, 'No.' I said, 'You better get busy and make one.' She said, 'I will. I should.' I said, 'To do that, you have to have a lawyer. I know nothing of wills.'"

The court admitted the statements of both witnesses over proponents' objections and a motion to strike the testimony but reserved its final ruling thereon. The testimony of both witnesses was later excluded. .

Opponents contend the testimony was competent as disclosing an intention of the testatrix to revoke her will. It will be observed there was no testimony these conversations occurred after the testatrix had made her own alterations in the will. The conversations, therefore, may have occurred before she had made the alterations.

She erroneously may have concluded, as previously indicated herein, the alterations she made were legally sufficient without executing another will with the formalities required by law. Notwithstanding the testimony of these witnesses the court was confronted with the fact the testatrix had actually altered her will before she left for Arizona in the middle of February, 1952. The court also knew she had altered both wills in the same identical manner in order to make certain her intentions were clear. There were other important facts before the court. The court knew she had put both wills in one envelope, in their altered form, and had locked the trunk in which she placed them. Manifestly, she intended to preserve both instruments in their altered form. These facts indicate she may have concluded the will, as altered, was legally sufficient or they may indicate deliberative intent to have a new will drawn on her return pursuant to the alterations indicated therein. If the latter were her intention she failed to accomplish it as she died before her return. Under these circumstances, as already indicated, there was ample room to conclude the testatrix did not intend destruction but reconstruction of her will; that she intended alteration rather than revocation of the entire will. Therefore, only the will as originally executed could be admitted to probate. Of course, ordinarily proper testimony disclosing an intention to revoke a will is admissible. Assuming the testimony of the witnesses was competent we fail to see how its exclusion constitutes reversible error in this case. Opponents argue there was no conflict in the testimony and this court may pass upon its effect in the same manner as the trial court. Viewing the record in its entirety we think we would not be justified in reversing the decision of the trial court even if we considered the evidence of the witnesses as competent. In passing we also may say this testimony was cumulative in its character as the court had admitted similar testimony in the cross-examination of one of proponents' witnesses over objections of proponents' counsel. Proponents have not cross-appealed from that ruling and we shall not pursue the matter.

It frankly should be conceded there is respectable authority in some jurisdictions to support a contrary decision. Able counsel for opponents have forcibly directed our attention thereto. We do not deem it necessary to review the cited cases. The principal questions involved received extended consideration in the Johannes case, *supra*. We have re-examined that decision and adhere to it.

The judgment of the district court is affirmed.

## "FINDINGS OF FACT.

"1. LONA B. GRISELL, a resident of Ness County, Kansas, died at the age of 71 years, on the 26th day of March, 1952, at Tempe, Arizona. She was a widow; had no children, and her sole and surviving heirs at law were her brothers, Orris W. Marhofer, Ray N. Marhofer and Olin J. Marhofer; and Vernon J. Marhofer, a nephew, and Doris M. Kraus, a niece, children of Vernon Marhofer, who died in July, 1951. In addition to Vernon J. Marhofer she left two other nephews, Basil C. Marhofer, son of Olin J. Marhofer, and Wayne or Duane Marhofer, son of Orris W. Marhofer.

"2. The inventory of her estate shows real estate of the value of about $140,000.00; stocks and bonds and other personal property of the value of about $30,000.00. Commencing with the year 1936, Lona B. Grisell purchased at different times stocks and bonds for the benefit of her different brothers. These stocks and bonds were taken in the name of Lona B. Grisell as trustee for her different brothers. About February 15th, 1952, she purchased United States Savings Bonds in the amount of $2,250.00; $750.00 in the name of Lona B. Grisell or O. J. Marhofer; $750.00 in the name of Lona B. Grisell or R. N. Marhofer; and $750.00 in the name of Lona B. Grisell or John Marhofer. (Her nephew.)

"3. Lona B. Grisell was a well educated person; school teacher and pharmacist. During her married life she resided at Ransom, Kansas. After she became a widow she moved to Johnson, Kansas, at which place she operated a drug store for a number of years. She was a successful business woman, and the greater part of her estate was accumulated by her after she became a widow. That at all times Lona B. Grisell was of sound mind and disposing memory, and entirely competent to make or revoke a will. The last few years of her life she resided on one of her farms between Ransom, Kansas, and Arnold, Kansas. This farm was located about two miles southeast of Arnold. Her business was carried on through the bank at Johnson, Kansas; the First State Bank at Ransom, Kansas, and the Arnold State Bank. In the last two named banks, during the later years of her life, she kept a strong box, or safety deposit box.

"The deposit box in the Ransom State Bank was a locked box. The deposit box at the Arnold State Bank was not a locked box. In February 1952, Lona B. Grisell purchased some bonds. These were ordered by Mr. Leslie Fry and upon their arrival were placed by him in the deposit box, in the absence of Lona B. Grisell.

"4. That on the 19th day of July, 1948, Lona B. Grisell went to the First State Bank of Ransom, Kansas. She requested Fred Amstutz, a cashier of the bank, to draw a will for her and told him the terms of the will. Two copies of the will were made. Each copy was executed by Lona B. Grisell and each copy was witnessed. One of the copies of the will she left in her safety deposit box in the Ransom State Bank, and the other copy she took with her. Under the second paragraph of her will she devised her entire estate to 'my nephews, Basil C. Marhofer and Vernon J. Marhofer, Jr., equally.' In the third paragraph she appointed Vernon J. Marhofer, Sr., as her sole executor. Vernon Marhofer, Sr., died in July, 1951.

"5. In the fall of 1951 Lona B. Grisell went to the First State Bank at Ransom, Kansas, and asked for her safety deposit box. She took from the safety deposit box her will, and at that time stated that she wanted to get the will because she wasn't satisfied with it; she wanted to destroy it, and might make another one. She took the will with her at that time.

"6. In February of 1952 Lona B. Grisell went to the Arnold State Bank and stated she was not in good health and intended to go to Arizona for her health. She was advised to gather up her valuable papers and leave them at the Arnold State Bank, some of the papers at that time being in Johnson, Kansas. A few days thereafter she appeared with some jewelry and papers and placed them in her safety deposit box. This box was later found to contain her stocks and bonds. Also some deeds to real estate, oil leases, abstracts, deposit slips, some jewelry and other items.

"7. About the middle of February, she gave to Ivy Sweasy, a close friend of hers, some keys and then went to Tempe, Arizona. Her brother Orris Marhofer taking her to Liberal, from which point she took the train. Later, in response to a call, Orris Marhofer went to Tempe, Arizona, and he was there at the time of her death. Her belongings were delivered to him, which included her bag, or purse.

"After the funeral Orris Marhofer went to Ivy Sweasy and obtained from her the keys which Lona B. Grisell left there. He took Lona B. Grisell's purse and left *them* in her house. Then he went to Tribune, Kansas. A few days thereafter the parties interested met at the residence of Lona B. Grisell. Orris Marhofer, from his person, produced keys to unlock a trunk and cedar chest which had been left locked by Lona B. Grisell. The keys to the cedar chest and trunk, having been obtained by Orris Marhofer.

either from her purse, or from Ivy Sweasy. The keys were then kept by Orris Marhofer, until the trunk was unlocked.

"8. The above mentioned trunk was in a second floor bedroom. It contained a removable tray. In this tray, on top, were articles, largely of a sentimental value, such as jewelry, linens, silverware, and other odds and ends. Underneath these articles, but in the tray, was found an envelope which contained the two copies of the will hereinbefore described. An examination showed the names of Basil C. Marhofer and Vernon J. Marhofer, Jr., had been marked through several times with pencil.

"The cedar chest contained goods; dress goods; an old quilt, which she valued as a keepsake; some dolls; her parents' marriage license; and other articles.

"The pencil markings on each copy covered practically all of both names. They were almost identical on each copy as though one was made and then the other made with an intent to make exactly the same markings on the other copy. The names were however, readily distinguishable through such markings on both copies of the will.

"9. There was some evidence offered that these markings were not on the copy of the will at the time it was taken from the bank by Lona B. Grisell in the fall of 1951. The witness however did not testify that he made an examination of the will at that time. He stated he saw the will. A will left in a safety deposit box is usually folded. There was no testimony of the witness that he unfolded the will and examined it; no testimony of the witness that after he handed the will to Lona B. Grisell she unfolded the will and showed it to him; no evidence of an examination of the will that would justify the conclusion drawn by the witness that there were no pencil markings on the will. The court is unable therefore to determine whether or not the pencil markings were on the will at the time it was taken from the bank and there is no other evidence to show as to when the pencil markings were made on the different copies of the will.

"10. The copies of the will were found in a locked trunk in the home of Lona B. Grisell and the Court presumes the markings were made (at some time unknown) by Lona B. Grisell.

"11. At the time Lona B. Grisell made the pencil cross marks and lines through the names of Basil C. Marhofer and Vernon J. Marhofer, Jr., on the two copies of the wills, she was deliberating

upon, and considering, the matter of altering or changing said paragraph merely for the purpose of reallocating among her nephews the property therein described; but it was not her intention to revoke the wills, or any part of the same, and no intention or act manifesting such intention to revoke was ever consummated.

### "CONCLUSIONS OF LAW.

"1. The parties agree that at all times Lona B. Grisell was mentally competent to make or revoke a will and that the two copies of the will were executed and witnessed as required by law.

"2. Lona·B. Grisell made the pencil markings on the copies of the will. Two copies of the will were made in 1948. One copy was left in her deposit box in the First State Bank of Ransom, Kansas and the other copy she took with her. In the fall of 1951 she obtained the copy at the bank. After her death in March, 1952, the two copies of the will were found in a locked trunk in her home. Under these circumstances, the presumption is that the pencil markings across the names were made by Lona B. Grisell. *Sellards vs. Kirby,* 82 Kans. 291 at 298. The evidence offered as to Orris Marhofer obtaining and keeping the key to the trunk is insufficient to overcome the above-described presumption.

"3. The pencil marks across the names on the copies of the will were not made by testatrix with an intent to cancel, revoke or destroy said will or any part thereof.

"4. The will offered is the Last Will and Testament of Lona B. Grisell and should be admitted to probate as originally typewritten."